**John David CHERRY Jr., Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**2013–SC–000201–MR**

Supreme Court of Kentucky.

RENDERED: FEBRUARY 19, 2015

Rehearing Denied May 14, 2015

COUNSEL FOR APPELLANT: Linda Roberts Horsman, Assistant Public Advocate, Department of Public Advocacy, 100 Fair Oaks Lane, Suite, 500 Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE: Jack Conway, Attorney General, Bryan Darwin Morrow, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky 40601

OPINION OF THE COURT BY JUSTICE NOBLE

The Appellant, John David Cherry, Jr., was convicted of murder, first-degree wanton endangerment, second-degree unlawful imprisonment, carrying a concealed deadly weapon, third-degree trafficking in a controlled substance, trafficking in marijuana less than eight ounces, and possession of a controlled substance not in its original container. He was sentenced to life in prison. On appeal, he challenges his convictions on several grounds as set forth below. Finding no reversible error, this Court affirms.

## I. Background

Cherry testified that the events in this case arose while he was in the midst of a multiple-day "bender" that took place from Friday, March 18, 2011, to early Sunday, March 20, 2011. He testified that he did not sleep from the time he awoke on Friday morning until he was booked into jail after his arrest Sunday morning and that

he had used copious amounts of drugs during this period.

As part of the bender, Cherry spent Saturday evening and early Sunday morning ingesting a variety of intoxicating substances with friends. He began the night with his friend, Mike Maudlin, with whom he went to a bar in Lexington. At around 2:00 a.m., another friend, Richie Perez, picked them up from the bar and drove them to Maudlin's home. Throughout the night, Cherry and his friends drank alcohol, smoked marijuana, used cocaine, and took prescription pills, including Klonopin.

Shortly after arriving at Maudlin's, Cherry called his cocaine dealer, who lived in a Hedgewood Court apartment in the Woodhill subdivision. Cherry tried to get Maudlin or Maudlin's roommate to drive him to Hedgewood Court, but both declined. And Maudlin took a Klonopin and fell asleep shortly thereafter. Cherry then called for a taxi from Yellow Cab of Lexington. Amine Lemghaili was dispatched and arrived at Maudlin's residence to pick up Cherry at 3:09 a.m.

At 3:19 a.m., Lemghaili's taxi pulled into the Hedgewood Court parking lot. Due to inconsistencies between Cherry's statements to police and testimony at trial, what happened next is unclear, but it is undisputed that Cherry killed Lemghaili by shooting him in the back of the head with a .38–caliber revolver that belonged to Maudlin. Around 3:20 a.m., a resident of Hedgewood Court heard a gunshot followed by an engine accelerating. Surveillance footage showed Cherry walking from Hedgewood Court across some basketball courts toward Osage Court at 3:21 a.m.

Cherry's flight from the scene first led him to a friend's house nearby. The friend was unhappy with Cherry for coming to his house and knocking on his door at that hour, and Cherry was forced to leave shortly after arriving.

At 3:40 a.m., Cherry called Perez, who also lived nearby on Osage Court, but Perez did not answer. Sometime after making this call, Cherry met up with another friend, "AK." Because Cherry could not get in touch with Perez, he asked AK to walk to Perez's house and tell Perez to come pick him up and drive him back to Maudlin's apartment.

Shortly thereafter, Perez picked up Cherry and drove him back to Maudlin's residence. During the drive, Cherry acted shaken and scared. He told Perez that he could not believe what he had done but would not tell him what had happened.

Cherry placed a call to his girlfriend, Delania Bates, at 4:11 a.m., and asked her to come get him at Maudlin's house and drive him to her apartment.

It is unclear at what time Cherry arrived at Maudlin's apartment, but when they arrived, he and Perez smoked marijuana. Then Perez drove home. Also while at Maudlin's, Cherry retrieved his .45–caliber pistol and returned Maudlin's .38–caliber revolver.[1]

Around 5:00 a.m., Bates arrived at Maudlin's to pick up Cherry, at which time she saw him snorting cocaine. They then drove to her apartment.

An argument between Cherry and Bates ensued during the car ride, and once inside Bates's apartment, Cherry fired a shot in

1. Maudlin had recently purchased the .38–caliber revolver and had only fired it once. Before they went to the bar that evening, Cherry swapped his .45–caliber pistol with Maudlin's revolver. Cherry knew Maudlin kept his gun under his couch cushion, and it was apparently common for the two friends to temporarily trade firearms. Maudlin did not know that his gun had been fired a second time until the police came to his house to retrieve it, at which time he noticed that two of the revolver's chambers were marred.

her vicinity.[2] The bullet traveled through the wall and became lodged in a kitchen cabinet in the adjacent apartment. They then left Bates's apartment for fear of the police coming and initially drove to Cherry's grandmother's house. She was not home, so they headed to Cherry's mother's house, which was "out in the country" some distance away. During this time, they continued to argue.

On the way to his mother's house, Bates told Cherry she needed gas, so they pulled into a Marathon gas station at around 7:45 a.m. When Cherry got out of the vehicle, Bates shut the doors and drove off. Cherry chased after her, pulling his gun and pointing it at the fleeing vehicle.

A bystander, John Thomas, had been getting gas at the Marathon station and witnessed what occurred. Still holding his handgun, Cherry approached and had Thomas drive him to Wal–Mart.[3] Once Cherry left his vehicle, Thomas called the police.

At 8:15 a.m., Cherry entered Wal–Mart and proceeded toward the sporting goods department. He spoke on the phone with his mother while walking through the store, and an employee overheard him say, "I love her. She left me. I'm gonna kill her." Before the employee could call and warn the employee in sporting goods of her concerns, Cherry arrived at the sporting goods desk and purchased .45–caliber ammunition. He then pulled his handgun from behind his back and began loading it. The employee at the sporting goods register told Cherry he could not load the gun inside the store, so Cherry tucked the gun back into his waistband and exited the store. Employees at Wal–Mart also called police.

Outside Wal–Mart, Cherry walked to an adjacent McDonald's parking lot, at which time he was spotted by Officer Matthew Smith, who confirmed Cherry matched the description provided by dispatch. Officer Smith exited his squad car, drew his weapon, and ordered Cherry to the ground. Ignoring Officer Smith's commands, Cherry dropped the Wal–Mart bag containing the recently purchased ammunition and reached for his gun. The officer took cover behind his vehicle and continued giving Cherry verbal commands, which were ignored. Cherry eventually dropped his weapon, and Officer Smith handcuffed him.

Shortly thereafter, Officer Jerry Parsons arrived on the scene and placed Cherry in the backseat of his cruiser. A search incident to arrest uncovered various drugs and cash in Cherry's pockets. Officer Parsons transported Cherry to the jail and interviewed him regarding the pills, Bates, Thomas, and Wal–Mart.

That morning, Lemghaili's body was discovered in his taxi at Hedgewood Court. Officer B.J. Blank was the first to arrive on the scene, and he noticed that the front wheels of the taxi van had jumped the parking curb. The taxi was in park with the ignition turned off. Officer Blank found Lemghaili's body slumped over in the driver's seat with the seat belt fastened and a gunshot wound to the back of the head. Through information gleaned from the GPS device in Lemghaili's taxi and his cell phone, the police discovered that Lemghaili's last phone conversation had been with Cherry and that his last

---

**2.** At trial, both Bates and Cherry testified that he had actually shot at a television, but in a recorded telephone conversation with his mother that was played for the jury, Cherry stated that he was shooting at Bates's head and missed because she ducked.

**3.** At trial, Cherry testified that he had offered Thomas $15 to give him a ride and had not threatened him with the gun or otherwise.

route driven had been from Maudlin's home to Hedgewood Court.

Cherry spoke with his mother on the phone several times while he was in jail, and these conversations were recorded. On March 21, 2011, Cherry told his mother he had been trying to shoot Bates in the head when he shot at her, but he had missed because she ducked. He also asked his mother if she had seen the City–Region Section of that day's Lexington Herald–Leader newspaper. She had, and Cherry said, "That was me." The top story in the City–Region Section was about Lemghaili's murder. Later, he stated, "I didn't think I had it in me. I blacked out."

After listening to this recorded conversation, detectives seized Cherry's personal effects—his clothing and cell phone—from the detention center. Blood was observed on Cherry's clothing. A forensic biologist later confirmed the presence of Lemghaili's DNA on Cherry's gloves and jacket.

Cherry called his mother again on March 24, telling her that he was in "so much more trouble now." He told her that the police had seized his cell phone, had found the bullet in the neighbor's apartment, and had spoken with Maudlin. He stated that he had "screwed up real, real bad"; had thrown away his life; and would be old and have gray hair when he got out of jail.

On March 25, after listening to the jail phone calls, Detectives Rob Wilson and Matt Brotherton decided to question Cherry about the Lemghaili shooting. Cherry stated that he had been very intoxicated on drugs and alcohol on Saturday night and claimed not to remember what had happened. He admitted to having gotten into an argument with Bates and shooting his gun in her apartment. Eventually, Cherry began crying and stated, "I seen his face on the news. I don't remember.

I woke up, and I was in jail." One of the detectives then asked, "What are we talking about?" and Cherry responded, "Talking about murder."

Cherry maintained throughout the interview that he did not know or remember what had happened that night. At one point, he stated, "I think I tried to walk away without paying for the cab." Later he said, "Because you don't believe me when I tell you stuff that I don't remember, I'm guilty. You're recording. I'm guilty. I swear to god I'm sorry, [inaudible] I deserve whatever happens to me." Several minutes later, after more statements of remorse and complaining that he only had occasional, brief flashes of what had happened that night, Cherry stated, "I would like to even say it was self-defense, but I would be lying and I don't know. I'm telling you now what I know."

At the end of the interview, Cherry was charged with Lemghaili's murder.

At trial, Cherry's primary defense was voluntary intoxication under KRS 501.080(1), which would have reduced his murder conviction to second-degree manslaughter, see Fields v. Commonwealth, 274 S.W.3d 375, 414 (Ky.2008) ("[V]oluntary intoxication is not an absolute defense, but rather reduces an intentional crime to one requiring a culpable mental state of wantonness."), overruled on other grounds by Childers v. Commonwealth, 332 S.W.3d 64 (Ky.2010).

He claimed that at the time of the shooting, he had not slept for two days; had consumed vast quantities of alcohol and various drugs, including marijuana, pills, and cocaine; and had been so intoxicated that he had not understood what was happening in the taxi cab and had not intended to shoot and kill Lemghaili. He testified that he had passed out in Lemghaili's taxi during the ride and that when awak-

ened by the driver yelling at him, he had believed some of his money was missing and accused the driver of stealing from him. Cherry testified that while they were yelling at each other—Cherry demanding, "Give me my money," and Lemghaili yelling, "Get out"—Lemghaili turned toward the front of the taxi and appeared to reach for something between his legs, at which time Cherry fired a shot toward the front of the vehicle. Cherry claimed at trial that he had believed Lemghaili may have been reaching for a weapon.

The jury found Cherry guilty of murder, first-degree wanton endangerment for the shooting in Bates's apartment, second-degree unlawful imprisonment relating to Thomas, carrying a concealed deadly weapon, third-degree trafficking in a controlled substance, trafficking in less than eight ounces of marijuana, and possession of a controlled substance not in its original container. He was sentenced to life in prison and now appeals to this Court as a matter of right. *See* Ky. Const. § 110(2)(b).

Additional facts will be developed as needed below.

## II. Analysis

### A. The trial court did not err in denying Cherry's motion to sever the murder charge from the other charges.

■ Cherry first claims that the trial court abused its discretion and committed reversible error by denying his motion to sever the murder charge from the other charges related to the events involving Bates, Thomas, and Wal–Mart. He contends that his shooting of Lemghaili was unrelated to the later events and that joining the charges allowed the Commonwealth to introduce otherwise inadmissible and prejudicial KRE 404(b) evidence of the jointly-tried offenses.

Joinder of multiple offenses in a single indictment is permitted "if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." RCr 6.18. Even if the requirements of Criminal Rule 6.18 are met, the trial court should nevertheless order the offenses be tried separately if joinder would be prejudicial to either the defendant or the Commonwealth. RCr 9.16. When moving for severance under Criminal Rule 9.16, "a defendant must prove that joinder would be so prejudicial as to be unfair or unnecessarily or unreasonably hurtful." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 264 (Ky.2006) (internal quotation marks omitted); *see also Parker v. Commonwealth*, 291 S.W.3d 647, 656–57 (Ky.2009) ("Because a defendant is prejudiced simply by virtue of being tried at all, we require a defendant to show that he would be 'unfairly prejudiced' by a joinder.").

■ Trial judges are vested with great discretion in determining whether to join or sever offenses, *Brown v. Commonwealth*, 458 S.W.2d 444, 447 (Ky.1970), and this Court has consistently declined to disturb that discretion absent a showing of clear abuse and actual prejudice, *e.g.*, *Spencer v. Commonwealth*, 554 S.W.2d 355, 357 (Ky.1977). Before an appellate court will reverse a trial court's joinder decision, it "must be clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge that the refusal to grant a severance was an abuse of discretion." *Murray v. Commonwealth*, 399 S.W.3d 398, 405 (Ky.2013); *see also Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky. 2013) ("[W]e have many times noted that an erroneous severance ruling does not justify appellate relief unless it resulted in

actual prejudice to the party opposing the ruling.").

■■■ This Court has long held that joinder is proper under Criminal Rule 6.18 when "the crimes are closely related in character, circumstance, and time." *Seay v. Commonwealth*, 609 S.W.2d 128, 131 (Ky.1980). "Offenses that stem from closely related events and which occur within a short period of time may be properly joined in one indictment." *Chestnut v. Commonwealth*, 250 S.W.3d 288, 299 (Ky.2008). As this Court has previously explained, to justify joining separate offenses in a single trial, "[t]here must be a sufficient nexus between or among them." *Peacher*, 391 S.W.3d at 837. The required nexus must arise "from a 'logical' relationship between [the crimes], some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan." *Id.*

Here, all of the charges stemmed from Cherry's continuous course of conduct spanning only about five hours. As the trial court aptly noted, at no point during that five-hour period was the defendant doing nothing. A clear, unbroken chain of events connected the shooting in the taxi to Cherry's ultimate arrest after exiting the Wal–Mart. Indeed, the events leading to his commission of each of the charged crimes were like falling dominos, with each poor decision inexorably leading to the next. Despite the dissent's unfounded fears that we are interjecting a "new 'continuous course of conduct' standard" for permitting joinder of dissimilar offenses, we use that phrase only as a general description of the events leading from the murder to Cherry's ultimate arrest, not as a dispositive finding. Rather, the facts here certainly demonstrate that a clear nexus and logical relationship exists between these events. And we, therefore,

must conclude that the separate charges were properly joined under RCr 6.18.

Having concluded that joinder was proper, we further hold that Cherry has not shown sufficient undue prejudice to convince us that the trial court abused its discretion in refusing to sever the charges. *Murray*, 399 S.W.3d at 405.

■■■ It is true, as Cherry argues, that a primary consideration in assessing whether undue prejudice resulted from the joinder of offenses is "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky.2002). KRE 404(b), which prohibits evidence of other crimes from being introduced to show the defendant's general criminal predisposition, is therefore typically at the forefront of this analysis. Evidence of other crimes is admissible, however, if introduced for some "other purpose," such as proof of motive, opportunity, intent, identity, or absence of mistake, KRE 404(b)(1), or if "inextricably intertwined" with other evidence in the case, KRE 404(b)(2).

Cherry cannot show undue prejudice here because the evidence of the events relating to the wanton endangerment, unlawful imprisonment, and drug charges would have been admissible at a separate murder trial for an "other purpose" under KRE 404(b)—namely, as "an expression of a sense of guilt." *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky.2003). Cherry's conduct after the murder—leaving the scene at Hedgewood Court, having Perez drive him back to Maudlin's, trading out guns, having Bates drive him to her apartment and then to his grandmother's house after shooting his gun in her apartment, stopping at the gas station on the way to his mother's house, forcing Thomas to drive him to Wal–Mart after being left at the gas station, purchasing ammunition,

and finally resisting arrest and brandishing his weapon [4]—amounts to evidence of flight from the murder scene. With each new act, it can be perceived that Cherry sought to further distance himself, figuratively and literally, from the murder.

And evidence of a defendant's flight or attempts to avoid arrest has long been admissible under Kentucky law "to show a sense of guilt because flight is always some evidence of a sense of guilt." *Doneghy v. Commonwealth,* 410 S.W.3d 95 (Ky.2013) (citation and internal quotation marks omitted). Indeed, "where one after the commission of a crime flees from a place, and either evades or actively resists arrest, all facts and circumstances showing the evasion or resistance of arrest even though they disclose the commission of another crime, are competent against him upon a trial for the first offense." *Fallis v. Commonwealth,* 197 Ky. 313, 247 S.W. 22, 24 (Ky.1923). Because the facts and circumstances of Cherry's fleeing and attempting to avoid arrest following the shooting, which include those relating to the other charges, would be admissible in a trial for the murder of Lemghaili, his evidentiary objections to joinder are not persuasive.

Cherry's defense and strategy at trial further bolsters our conclusion that joinder did not result in actual, undue prejudice. Cherry admitted that he had been a drug-dealer and that he had possessed and consumed copious amounts of illicit substances over the two-day period culminating in his arrest. His defense against intentional murder was that he essentially had a mental breakdown and his depression had led him to go on a two-day "bender" during which he ingested various substances to "dull the pain"—i.e., alcohol, marijuana, and pills—while correspondingly using cocaine to counteract their depressant effects and stay awake. As a result, he claimed that he had lost his grip on reality and had committed acts (shooting Lemghaili, shooting in Bates's apartment, threateningly brandishing his gun at the gas station, etc.) that he would not have committed otherwise. Thus, insofar as his own defense was concerned, the evidence relating to the other charges was "inextricably intertwined" with the murder charge, or was at least relevant.

Because joinder of the separate charges was proper and Cherry cannot show that he suffered undue prejudice as a result of all of the charges against him being tried in a single trial, there was thus no error in denying the motion to sever.

**B. The trial court's admission of propensity evidence in rebuttal to Cherry's interjection of character was harmless error.**

Cherry next claims that the trial court erred in permitting the Commonwealth, on redirect examination of Mike Maudlin, to elicit testimony that Cherry had fired his handgun out a car window a few weeks before the Lemghaili murder. Cherry argues that this was improper other bad acts evidence of his character for violence introduced in violation of KRE 404(b).

On the first day of trial, the Commonwealth called Maudlin to testify in its case-

---

4. Cherry testified at trial that he had purchased the ammunition for the purpose of ending his own life because of what he had done. He added that, when he realized the police were arresting him after he left Wal–Mart, he initially refused to get on the ground and momentarily brandished his gun because he hoped for "suicide by police." He apparently thought twice about this because after doing so he quickly dropped the gun and began following the arresting officer's orders, although he testified he had no explanation for the sudden change of heart.

in-chief. On cross-examination, Maudlin was asked about Cherry's state of intoxication:

> Counsel: Was John [Cherry] acting intoxicated when he was around you [on the night of the Lemghaili murder]?
>
> Maudlin: Yes. He seemed out of sorts. Normally he's real upbeat, bubbly, talkative, very cordial with people. Everybody likes him. That night it was very opposite for him. But it had been like that gradually over the time I [inaudible] over the week before. He, but yeah, we were definitely intoxicated before we. went to the bar and before we left.

For the next several minutes, defense counsel's line of questioning turned to the subject of the various drugs and alcohol Maudlin had consumed and had seen Cherry consume both before and after going to the bar on the night of the Lemghaili murder. Defense counsel then concluded her cross-examination with the following:

> Counsel: You said he was out of sorts?
>
> Maudlin: Yes.
>
> Counsel: Was he acting like himself?
>
> Maudlin: No.
>
> Counsel: Had you ever seen him act this way before?
>
> Maudlin: Not like this, to the, no. Not like that.
>
> Counsel: Then something was definitely wrong with him?
>
> Maudlin: Yes.

On rebuttal, the prosecutor argued that the defense, by eliciting testimony on the defendant's character, had "opened the door" for the Commonwealth to have Maudlin testify to an incident that had occurred a few weeks prior to the night in question when he had been riding in a car with Cherry, who was drinking and had fired his handgun several times out the vehicle's window.

Defense counsel objected on the grounds that this was inadmissible evidence of other bad acts offered to prove action in conformity in violation of KRE 404(b) and that the Commonwealth had not provided notice as required by KRE 404(c). Defense counsel further argued that she had not "opened the door" to this evidence as claimed by the Commonwealth because none of Maudlin's testimony on cross-examination had involved Cherry's character for violence or peacefulness. The trial court overruled the objection and allowed the following line of questioning by the Commonwealth:

> Prosecutor: A couple weeks before [the night of the Lemghaili murder] do you remember an incident that took place when you and the defendant were out with Richie [Perez] riding around?
>
> Maudlin: Yeah. I think it was sometime around that time frame.
>
> Prosecutor: Tell us what happened.
>
> Maudlin: We had been leaving somewhere. I was getting a ride, heading back to my place. John [Cherry] was upset. We had been drinking and smoking [pot] I think prior. He was upset and shot his gun a couple times out the window, and we took the gun away and went back to my place and just kind of tried to relax.

In overruling the objection and permitting the questioning, the trial court reasoned that the defense had put Cherry's character at issue and thus opened the door for admission of the character evidence proffered by the Commonwealth in rebuttal. The judge further concluded that notice was not required because the Commonwealth offered the evidence only in rebuttal.

Evidence of a person's character is generally inadmissible for the purpose of proving action in conformity with that charac-

ter or trait of character, subject to a few exceptions. KRE 404(a). One instance when character evidence is permissible is when "[e]vidence of a pertinent trait of character or of general moral character [is] offered by an accused, or by the prosecution to rebut the same." KRE 404(a)(1). The pertinent trait the Commonwealth wanted to prove is Cherry's propensity to fire his gun recklessly when he was intoxicated. Certainly, the Commonwealth could not have offered this evidence in its case-in-chief because it fits into no exception to the exclusionary rule of KRE 404(b).

But here, the *accused* introduced the question of how Cherry had acted "before." Defense counsel asked Maudlin if Cherry was acting like himself on the night of the crimes, or if he had ever "seen him act this way before?" Maudlin answered "No."

The exception on the admissibility of propensity conduct in rebuttal when the defendant himself introduces such conduct is designed to prevent the jury from being misled when a witness puts his conduct in issue by saying that such conduct was out of the ordinary, or had never occurred before. The Commonwealth can rebut this.

But rebuttal evidence must be directly related to the evidence it rebuts. Maudlin's testimony must be understood in context to what he could actually testify about. Cherry was present in Maudlin's apartment on the evening the series of events began. He and Maudlin went to a bar, met up with a friend, and the three returned to Maudlin's home. Maudlin took a Klonopin when they got back and fell asleep shortly thereafter. Cherry then called a cab to go get cocaine. During this time period, the cab driver was shot and killed. Cherry called Perez to come get him and take him back to Maudlin's apart-

ment. Cherry then left with his girlfriend around 5:00 a.m.

While Maudlin was aware that Cherry carried a gun, he *never* saw Cherry waving or recklessly firing a gun during this time period. So when he was asked about how Cherry was acting, he could only be testifying to what he saw during the time Cherry was with him. And, necessarily, rebuttal had to be framed to counter what Maudlin said he saw while he was with Cherry that night.

In fact, Maudlin's initial testimony was *demeanor* testimony, not character testimony. The character flavor was added by defense counsel when she asked if he had ever *acted* this way *before*. Maudlin essentially said that Cherry had never been this quiet or depressed before, implying this conduct was out of character. This is precisely *all* the Commonwealth could rebut: that Cherry was in fact generally quiet and depressed.

Thus, there was no nexus to the specific acts of recklessly firing a gun while intoxicated, and permitting the Commonwealth to interject such acts was error. The question then is whether this improperly admitted rebuttal evidence is error so prejudicial that this Court must reverse.

■ In favor of reversal is the fact that Cherry raised as a defense to murder the evidence that he was so intoxicated that he could not form the requisite intent under the murder statute. A juror wavering between finding him guilty of murder and some lesser homicide might find that just a few weeks before the night of these crimes, Cherry was intoxicated and firing a gun out a car window going down the road, was the tipping point between believing he was so intoxicated he lacked capacity to know what he was doing and holding him responsible because he knew he had committed similar conduct before.

Cherry initially claimed blackout, and denied any knowledge of the killing. But he seemed to have significantly recovered his memory of events by trial. He testified that he passed out, but woke up to the driver yelling at him. He believed the driver had stolen some of his money, and argued with him. He testified the driver reached between his legs; he believed the driver was going for a weapon. He then fired his gun toward the front of the cab, essentially in self-defense. He admitted that he shot the cab driver, even though at first he claimed not to remember anything about the event. He told Perez shortly after the killing that he could not believe what he had done, but would not tell him what had happened. He deliberately switched guns with Maudlin once back at Maudlin's apartment. The improper rebuttal testimony clearly had no effect on whether the jury would find him guilty. The only question was whether he was guilty of murder or something less.

Cherry's own testimony indicated intentional, knowing conduct. Therefore, this Court cannot say that it was the improper rebuttal evidence that substantially affected the jury's decision to find him guilty of murder instead of a lesser offense. When the conduct is compared to what he said happened at trial, there is no likelihood that the rebuttal evidence affected the verdict. Therefore, the admission of this evidence was harmless. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009) ("A non-constitutional evidentiary error may be deemed harmless ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.").

**C. The trial court's erroneous admission of the detective's testimony on Cherry's truthfulness during post-arrest interview is harmless.**

█ Cherry next claims that the trial court erred in allowing the prosecution to ask Detective Wilson whether he believed Cherry had been honest with him during his interview on March 25, 2011. Specifically, the prosecutor was permitted to ask the detective, "Based on the jail phone calls [between Cherry and his mother] you had heard, in your interview with him, did you believe that Mr. Cherry was being honest?" Detective Wilson replied, "No." The Commonwealth was permitted to ask this question on redirect-examination of the detective in response to a line of questioning on cross-examination where defense counsel asked several questions relating to Cherry's honesty. The questions were framed around Cherry telling the detective that Cherry was being "honest," that he was "having a hard time remembering," and that he was being as forthcoming as he could be. To these questions, the detective basically replied that that was what Cherry had said.

The trial court then allowed the prosecutor to ask the detective whether he believed Cherry was being honest, over defense objection, on the grounds that the defense had opened the door through its questioning on cross-examination.

█ This Court has long "disapprove[d] of the practice of asking a witness whether another witness [has lied]." *Hall v. Commonwealth*, 337 S.W.3d 595, 602 (Ky.2011); *see also Lanham v. Commonwealth*, 171 S.W.3d 14, 23 (Ky.2005) ("[I]t is generally improper for a witness to characterize the testimony of another witness as 'lying' or otherwise."). "A witness's opinion about the truth of the testimony of another witness is not permitted.... That determination is within the exclusive province of the jury." *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997) (quoting *State v. James*, 557 A.2d 471, 473 (R.I.1989)).

The question posed by the Commonwealth to Detective Wilson falls under this general prohibition.

As defense counsel repeatedly pointed out during its cross-examination of the detective, Cherry stated numerous times during the pre-trial interrogation that he was telling the truth and being as forthcoming as he could be given what he claimed to be able to remember. While defense counsel improperly called for an opinion as to the truthfulness of Cherry's statements during the interrogation when she asked, "And he was being as forthcoming as he could be *as far as you could tell?*" (emphasis added), the detective properly answered the question by saying, "As far as I could tell. Only he could answer that." Thus the trial court erred by allowing the Commonwealth to compound the improper questioning which had already been answered with the only appropriate response.

Nonetheless, this error is harmless. In his own testimony, Cherry admitted that he had lied to the police. And, when weighed against his admission that he had actually committed the killing, there is no likelihood that this substantially affected the verdict.

**D. Crime-scene photograph showing the gunshot wound was admissible.**

▇▇▇ Cherry also claims that the trial court should not have allowed the Commonwealth to introduce a crime-scene photograph of Lemghaili's body showing the fatal gunshot wound. Cherry argues that the position of Lemghaili's body at the time of the shooting differed from the photo because the driver's side door had been opened to take the photo, which allowed his body to shift from its original position leaning against the window. He also claims that "all necessary facts" were covered by witness testimony, and the photo added nothing to the proof. According-

ly, Cherry contends that the photograph only served to inflame the passions of the jury and was therefore inadmissible.

▇▇▇ Graphic photographs, like all other evidence, are generally admissible even if prejudicial, if they are relevant. *See* KRE 401, 402. "[A] photograph, otherwise admissible, does not become inadmissible simply because it is gruesome." *Funk v. Commonwealth,* 842 S.W.2d 476, 479 (Ky.1992). This general rule is limited by KRE 403, which directs the trial court to conduct a balancing test to determine whether the probative value of evidence "is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Thus, probative photos are admissible "unless they are so inflammatory that their probative value is substantially outweighed by prejudicial effect." *Adkins v. Commonwealth,* 96 S.W.3d 779, 794 (Ky.2003). This decision is left to the "sound discretion of the trial judge" and this Court reverses only for an abuse of that discretion. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

▇▇▇ Here, Cherry incorrectly maintains that the photograph in question had no relevance to the Commonwealth's case because it did not depict the original position of the body. But for evidence to be relevant, it need only be minimally probative of a fact of consequence. *E.g., Springer v. Commonwealth,* 998 S.W.2d 439, 449 (Ky.1999).

The photograph at issue is the only photograph at the crime scene clearly showing the fatal head wound. The image is direct evidence that Lemghaili was shot in the back of his head while buckled into the driver's seat of his taxi and is more than minimally probative of the crime of mur-

der. *See Ernst v. Commonwealth,* 160 S.W.3d 744, 757 (Ky.2005) (photos of a victim's corpse are relevant to show the nature of the injuries inflicted on the victim).

Cherry first claimed that he had no memory of the shooting, then admitted to "flashes" of memory, and finally testified at trial that he thought the victim was reaching for a gun and that he fired at the front of the cab, but did not intend to shoot him. The placement of the shot, that the driver was still buckled in his seat, and that the car had been running before Cherry turned it off, all point to a version of events different from Cherry's description. Seeing the actual scene and the wound itself is probative that Cherry did something other than fire a wild shot, and directly supported the Commonwealth's theory of murder rather than a lesser degree of homicide.

And, while gruesome, there was only one photo entered into evidence, and it was directly relevant to the charge of murder. And, this probative evidence is not made unnecessary by other witnesses' testimony. In fact, the testimony of the other witnesses lessened some of its inflammatory nature because the jury knew what to expect, and the photo obviously completes the full story as well as potentially rebutting a claim of a lesser degree of homicide. It is clear that the probative value of the photo outweighs its prejudicial effect, and the trial court therefore did not abuse its discretion by admitting it.

**E. Cumulative error does not require reversal.**

Lastly, Cherry contends cumulative error requires reversal of his convictions. *See Funk v. Commonwealth,* 842 S.W.2d 476, 483 (Ky.1992) (noting that "the cumulative effect of the prejudice" of multiple errors can warrant reversal). However, having found only two errors which do not warrant reversal, and which do not make this trial fundamentally unfair, there can be no finding of cumulative error. *See, e.g., Elery v. Commonwealth,* 368 S.W.3d 78, 100 (Ky.2012) ("[T]he [cumulative error] doctrine is necessary only to address multiple errors ... if their cumulative effect is to render the trial fundamentally unfair." (internal quotation marks omitted)).

### III. Conclusion

For the reasons set forth above, the judgment of the Fayette Circuit Court is affirmed.

Minton, C.J.; Abramson, Cunningham, Keller, Noble and Venters, JJ., sitting. Minton, C.J.; Abramson, Cunningham and Keller, JJ., concur. Venters, J., dissents by separate opinion.

VENTERS, J., DISSENTS:

I respectfully dissent. RCr 6.18, in tandem with RCr 9.12, governs the circumstances in which different offenses charged against the same defendant may be prosecuted in the same trial.[5] RCr 6.18, which

---

**5.** RCr 6.18 provides: "Two (2) or more offenses may be charged in the same complaint or two (2) or more offenses whether felonies or misdemeanors, or both, may be charged in the same indictment or information in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan."

RCr 9.12 provides: "The court may order two (2) or more indictments, informations, complaints or uniform citations to be tried together if the offenses, and the defendants, if more than one (1), could have been joined in a single indictment, information, complaint or uniform citation [pursuant to RCr 6.18]. The procedure shall be the same as if the prosecution were under a single indictment, information, complaint or uniform citation."

exclusively provides the criteria for determining when different crimes may properly be joined in a single trial, identifies two instances for the proper joinder of separate crimes. As noted by Professor Abramson, "The Commonwealth may charge separate crimes in separate counts if the offenses: (1) are of the same or similar character; or (2) are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." *See* Leslie W. Abramson, *Joinder by Commonwealth by Indictment or Information*, 8 Ky. Prac.Crim. Prac. & Proc. § 15.11 (5th ed. 2014). The majority opinion goes beyond the parameters of RCr 6.18 and now interjects a new standard for joinder of dissimilar offenses in a single trial—the "continuous course of conduct" standard.

The first basis for joinder expressly provided by RCr 6.18, crimes "of the same or similar character" has not been invoked here. No one in this case claims that Cherry's crimes fit that category. So, we properly focus our attention on the second basis for joinder under RCr 6.18: offenses "based on the same acts or transactions connected together or constituting parts of a common scheme or plan." To qualify for joinder under this theory, either of two preconditions must exist: (1) The crimes must be "based on the same acts or transactions connected together" or (2) they must "be based on the same acts or transactions [ ] constituting parts of a common scheme or plan."

As Professor Abramson explains, joinder under this theory is allowed "when the crimes are closely related in character, circumstances and time."[6] I emphasize

the use of the word "and" to denote that the temporal proximity of the crimes is alone insufficient under our rule; something more is required. Namely, the crimes must be also closely related in character and circumstances. In *Peacher v. Commonwealth*,[7] we held that to establish a "sufficient nexus between or among [the separate offenses] to justify a single trial" there must be "a 'logical' relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan." *Id.*

The majority gives a passing nod to *Peacher,* but then it displaces the language of RCr 6.18 with a new standard, proposed by the Commonwealth in its brief to this Court, redefining the rule for joinder to include crimes committed as a "continuous course of conduct." I dissent because (1) even under the majority's new incarnation of the joinder rule, Cherry's assorted crimes were not "a continuous course of conduct"; there was a sufficient interlude between each criminal act to break its relationship with the prior acts. And, (2) Cherry's assorted crimes do not qualify for joinder under the plainly written terms of RCr 6.18, our current rule for joinder.

I must also protest the majority's prejudice analysis. Citing to *Peacher,* the majority erroneously suggests that an improper joinder can be reversed on appeal only upon a clear showing of actual prejudice. On that point, however, *Peacher* was discussing RCr 9.16, the rule calling for the *severance* of properly-joined offenses when undue prejudice arises from the joinder. RCr 9.16 does not, as the majority

---

**6.** *See* Leslie W. Abramson, *Joinder and severance of offenses of same acts or transactions connected together or constituting common scheme or plan,* 8 Ky. Prac.Crim. Prac. & Proc. § 15.24 (5th ed. 2014).

**7.** 391 S.W.3d 821, 837 (Ky.2013).

suggests, ratify the mis-joinder of offenses simply because prejudice is not discernable.[8] *See Peacher,* 391 S.W.3d at 838. RCr 9.16 is a severance rule; RCr 6.18, coupled with RCr 9.12, are the joinder rules. Because Cherry's offenses were never properly joined for trial in the first place, RCr 9.16 has no application here.

The first prerequisite for joinder under the theory argued by the Commonwealth is that the different crimes must be *"based upon the same acts or transactions connected together."* Let us review Cherry's charges. According to the indictments, Cherry was charged with the following acts or transactions: shooting and killing taxi driver Amine Lemghaili in a parking area on Hedgewood Court in Lexington (murder); firing a gun in the apartment of his girlfriend, Delania Bates (wanton endangerment); unlawfully restraining gas station attendant John Thomas and forcing Thomas to drive him to a Wal–Mart store to buy bullets (unlawful imprisonment); possessing on his person a concealed handgun (possession of handgun by a convicted felon); possessing Tramadol with the intention of selling it (trafficking in a controlled substance); possessing marijuana (possession of marijuana); and possessing a prescription medicine in an improper container.

None of Cherry's crimes come even close to being "based on the *same* acts or transactions connected together." For an example of a proper joinder of crimes based upon the same acts or transactions *see Debruler v. Commonwealth,* 231 S.W.3d 752, 760 (Ky.2007). There, the defendant attempted to abduct a child and then, in an effort to flee the area, he attempted to rob another person of her car. We held that those crimes were "closely related in character, circumstance and time" because the attempted abduction prompted the getaway attempt and the need to steal a car. *Id.* The abduction of the victim and the escape from the scene was logically viewed as a single "transaction." The logical nexus later mentioned in *Peacher* was established by the evidence showing that the two crimes "arose one from the other or otherwise in the course of a single act or transaction." *Peacher* at 837.

There is no logical nexus between Cherry's acts of murder, wanton endangerment, and unlawful imprisonment. The majority likens Cherry's crimes to "falling dominoes" with each one "inexorably leading to the next." A falling domino, however, actually strikes the next domino in the line, causing it to fall upon another standing domino, and each domino in its turn actually hits the next one causing it to fall. What is it about Cherry's first domino (Amine's murder) that "inexorably" caused the next domino, the shooting at Delania's apartment, to fall? And from there, how did the wanton endangerment of Delania lead like a falling domino to the unlawful restraint of John Thomas? The answer is: nothing. There is no logical nexus that connected one to the other. It was not inevitable upon the murder of Amine (the first domino to fall) that Cherry would later endanger his girlfriend. The shooting in Delania's apartment (the second domino to fall) did not cause her and Cherry to drive together toward his grandmother's home, and it did not result in Delania leaving Cherry stranded at a gas station where he then unlawfully imprisoned the attendant. There was nothing inexorable about this sequence of events. The unlawful restraint of Thomas did not arise from the shooting in Delania's apart-

---

**8.** In any event, the improper presentation to the jury of the array of crimes committed here would, by any definition, result in undue prejudice.

ment, and neither of those events arose from the murder of Amine.

The majority contends these events were connected because at no time, between the murder of Amine and Cherry's arrest, was Cherry "doing nothing." That is true only in the existential sense that, as a being trapped within the time-space continuum, Cherry was always "doing" something and all of his acts and transactions occurred in sequential order, one after the other. That does not make them "connected together" as the term is used in RCr 6.18. It does not establish a "logical nexus" that connected one crime to the next.

None of Cherry's crimes occurred at the same place and they all occurred at different times, under different circumstances. Even if they were "close" (a relative term) in time, they are not "closely related in character and circumstances." Murdering Amine, shooting at Delania, imprisoning John, and possessing contraband are all based upon acts and transactions that are very different from each other—they are not of a similar or related character and they did not occur under similar or related circumstances. The only thing they have in common is that Cherry allegedly committed them all. That common denominator is not sufficient grounds for joinder.

After killing Amine Lemghaili, Cherry hitched a ride to Maudlin's apartment where he sat for over an hour and a half smoking marijuana and snorting cocaine with his friends. His flight from the scene of Amine's murder on Hedgewood Court was over. He was no longer on the run from that crime. Not a single event that occurred thereafter had any connection whatsoever to the murder. Whatever we define as the "acts or transactions" in which Amine was murdered, it could not reasonably be construed as encompassing, geographically and chronologically, everything Cherry did from the murder, through getting high at Maudlin's place, then going to Delania's place, getting angry with her, firing a gunshot through her apartment and leaving with her, stopping at the gas station where Thomas was taken captive, and then traversing through the Wal–Mart store and out onto the parking lot where he was arrested.

Cherry's crimes consisted of a series of *different* acts and transactions, not "the same acts or transactions connected together." The murder was completed in the parking lot at Hedgewood Court and Cherry completed his escape from the murder when he arrived at Maudlin's apartment. There is no set of facts or events that creates a logical link between the killing of Amine and the gunfire at Delania's place. And, similarly, there are no facts or circumstances creating a logical link between the gunfire at Delania's apartment and the abduction of Thomas at the gas station such that we might honestly say they are offenses "based on the same acts or transaction." Cherry's crimes are not based on the same acts or transactions connected together.

If not "connected together," separate offenses may be joined under RCr 6.18 if they are crimes "based on the same acts or transactions [ ] constituting parts of a common scheme or plan." What conceivable "scheme or plan" could Cherry have concocted that included all of his assorted crimes? It is impossible that the unlawful restraint of Thomas was part of a common plan or scheme that included the murder of Amine. Cherry would have had no idea that Delania's car would need gas, or that she would leave him stranded at the gas station where he encountered Thomas, or that he would want to go buy bullets. There is absolutely no evidence to prove, and even less reason to believe, that firing his gun in Delania's home served some part of a plan that also included killing

Amine. By all accounts the murder of Amine was an act of random violence; the shot fired in Delania's apartment was an act of rage apparently inspired by his belief that she had been out socializing all night; the unlawful restraint of Thomas was obviously an impulsive and desperate act to enable Cherry to get to the Walmart store to get bullets so he could go back and further endanger Delania; it was plainly not consistent with a plan of flight from the murder of Amine. No common plan or scheme encompassing those offenses is evident from the facts before us, and certainly none was apparent when the trial court denied Cherry's objection to joinder.

I would agree that the charges pertaining to Cherry's simultaneous possession of the drugs and the handgun could have been joined together for trial with each other. They fit comfortably within RCr 6.18's provision for joinder of crimes "of the same or similar character." Those charges might also be joined properly with the restraint of John Thomas because they all conceivably qualify as "parts" of a "common plan" to get bullets for his gun and return to Delania. But those acts have absolutely no connection to the murder of Amine Lemghaili, and certainly no connection of the kind defined in RCr 6.18 as proper grounds for joinder.

The unduly prejudicial effect of trying Cherry for murder at the same time he is tried for an unrelated felony of unlawful imprisonment and an unrelated wanton endangerment is manifest. By grafting its new phrase, "a continuous course of conduct," onto the provisions of RCr 6.18, the majority opinion unreasonably expands the conception of proper joinder, obscures the clarity of the rule, and interjects confusion into this body of law.

Because Cherry's various crimes do not fit into the paradigm of RCr 6.18, the majority sidesteps the language of this rule and rationalizes its resulting opinion with the foggy notion that joinder is proper because there was a "continuous course of conduct." That may not be a bad rule for joinder of separate offenses, but it is not *the rule* adopted by this Court under RCr 6.18 and RCr 9.12. We must read the terms of RCr 6.18 as they are, not as we might otherwise wish them to be. Therefore, I dissent.