LAMBERT, J., JUDGE:
John Cherry appeals from the Fayette Circuit Court order denying his motion for Kentucky Rule of Criminal Procedure (RCr) 11.42 relief. We affirm.
Cherry was convicted of one count each of murder, first-degree wanton endangerment, second-degree unlawful imprisonment, carrying a concealed deadly weapon, third-degree trafficking in a controlled substance, trafficking in marijuana (less than eight ounces), and possession of a controlled substance not in its original container. Cherry was sentenced to life imprisonment. His conviction was upheld on direct appeal in Cherry v. Commonwealth , 458 S.W.3d 787 (Ky. 2015). On August 27, 2015, Cherry filed a verified motion for RCr 11.42 relief, alleging that he received ineffective assistance of trial counsel. Cherry also requested an evidentiary hearing. Following a supplemented motion (wherein it was alleged that Cherry received ineffective assistance of counsel at the appellate level as well) and the Commonwealth's response, the Fayette Circuit Court, without holding an evidentiary hearing, entered its order denying Cherry's requested relief on February 28, 2017. Cherry appeals from that order.
The facts underlying the convictions are repeated from the Kentucky Supreme Court's opinion on direct appeal, namely:
Cherry testified that the events in this case arose while he was in the midst of a multiple-day "bender" that took place from Friday, March 18, 2011, to early Sunday, March 20, 2011. He testified that he did not sleep from the time he awoke on Friday morning until he was booked into jail after his arrest Sunday morning and that he had used copious amounts of drugs during this period.
*320 As part of the bender, Cherry spent Saturday evening and early Sunday morning ingesting a variety of intoxicating substances with friends. He began the night with his friend, Mike Maudlin, with whom he went to a bar in Lexington. At around 2:00 a.m., another friend, Richie Perez, picked them up from the bar and drove them to Maudlin's home. Throughout the night, Cherry and his friends drank alcohol, smoked marijuana, used cocaine, and took prescription pills, including Klonopin.
Shortly after arriving at Maudlin's, Cherry called his cocaine dealer, who lived in a Hedgewood Court apartment in the Woodhill subdivision. Cherry tried to get Maudlin or Maudlin's roommate to drive him to Hedgewood Court, but both declined. And Maudlin took a Klonopin and fell asleep shortly thereafter. Cherry then called for a taxi from Yellow Cab of Lexington. Amine Lemghaili was dispatched and arrived at Maudlin's residence to pick up Cherry at 3:09 a.m.
At 3:19 a.m., Lemghaili's taxi pulled into the Hedgewood Court parking lot. Due to inconsistencies between Cherry's statements to police and testimony at trial, what happened next is unclear, but it is undisputed that Cherry killed Lemghaili by shooting him in the back of the head with a .38-caliber revolver that belonged to Maudlin. Around 3:20 a.m., a resident of Hedgewood Court heard a gunshot followed by an engine accelerating. Surveillance footage showed Cherry walking from Hedgewood Court across some basketball courts toward Osage Court at 3:21 a.m.
Cherry's flight from the scene first led him to a friend's house nearby. The friend was unhappy with Cherry for coming to his house and knocking on his door at that hour, and Cherry was forced to leave shortly after arriving.
At 3:40 a.m., Cherry called Perez, who also lived nearby on Osage Court, but Perez did not answer. Sometime after making this call, Cherry met up with another friend, "AK." Because Cherry could not get in touch with Perez, he asked AK to walk to Perez's house and tell Perez to come pick him up and drive him back to Maudlin's apartment.
Shortly thereafter, Perez picked up Cherry and drove him back to Maudlin's residence. During the drive, Cherry acted shaken and scared. He told Perez that he could not believe what he had done but would not tell him what had happened.
Cherry placed a call to his girlfriend, Delania Bates, at 4:11 a.m., and asked her to come get him at Maudlin's house and drive him to her apartment.
It is unclear at what time Cherry arrived at Maudlin's apartment, but when they arrived, he and Perez smoked marijuana. Then Perez drove home. Also while at Maudlin's, Cherry retrieved his .45-caliber pistol and returned Maudlin's .38-caliber revolver.
Around 5:00 a.m., Bates arrived at Maudlin's to pick up Cherry, at which time she saw him snorting cocaine. They then drove to her apartment.
An argument between Cherry and Bates ensued during the car ride, and once inside Bates's apartment, Cherry fired a shot in her vicinity. The bullet traveled through the wall and became lodged in a kitchen cabinet in the adjacent apartment. They then left Bates's apartment for fear of the police coming and initially drove to Cherry's grandmother's house. She was not home, so they headed to Cherry's mother's house, which was "out in the country" some distance away. During this time, they continued to argue.
*321 On the way to his mother's house, Bates told Cherry she needed gas, so they pulled into a Marathon gas station at around 7:45 a.m. When Cherry got out of the vehicle, Bates shut the doors and drove off. Cherry chased after her, pulling his gun and pointing it at the fleeing vehicle.
A bystander, John Thomas, had been getting gas at the Marathon station and witnessed what occurred. Still holding his handgun, Cherry approached and had Thomas drive him to Wal-Mart. Once Cherry left his vehicle, Thomas called the police.
At 8:15 a.m., Cherry entered Wal-Mart and proceeded toward the sporting goods department. He spoke on the phone with his mother while walking through the store, and an employee overheard him say, "I love her. She left me. I'm gonna kill her." Before the employee could call and warn the employee in sporting goods of her concerns, Cherry arrived at the sporting goods desk and purchased .45-caliber ammunition. He then pulled his handgun from behind his back and began loading it. The employee at the sporting goods register told Cherry he could not load the gun inside the store, so Cherry tucked the gun back into his waistband and exited the store. Employees at Wal-Mart also called police.
Outside Wal-Mart, Cherry walked to an adjacent McDonald's parking lot, at which time he was spotted by Officer Matthew Smith, who confirmed Cherry matched the description provided by dispatch. Officer Smith exited his squad car, drew his weapon, and ordered Cherry to the ground. Ignoring Officer Smith's commands, Cherry dropped the Wal-Mart bag containing the recently purchased ammunition and reached for his gun. The officer took cover behind his vehicle and continued giving Cherry verbal commands, which were ignored. Cherry eventually dropped his weapon, and Officer Smith handcuffed him.
Shortly thereafter, Officer Jerry Parsons arrived on the scene and placed Cherry in the backseat of his cruiser. A search incident to arrest uncovered various drugs and cash in Cherry's pockets. Officer Parsons transported Cherry to the jail and interviewed him regarding the pills, Bates, Thomas, and Wal-Mart.
That morning, Lemghaili's body was discovered in his taxi at Hedgewood Court. Officer B.J. Blank was the first to arrive on the scene, and he noticed that the front wheels of the taxi van had jumped the parking curb. The taxi was in park with the ignition turned off. Officer Blank found Lemghaili's body slumped over in the driver's seat with the seat belt fastened and a gunshot wound to the back of the head. Through information gleaned from the GPS device in Lemghaili's taxi and his cell phone, the police discovered that Lemghaili's last phone conversation had been with Cherry and that his last route driven had been from Maudlin's home to Hedgewood Court.
Cherry spoke with his mother on the phone several times while he was in jail, and these conversations were recorded. On March 21, 2011, Cherry told his mother he had been trying to shoot Bates in the head when he shot at her, but he had missed because she ducked. He also asked his mother if she had seen the City-Region Section of that day's Lexington Herald-Leader newspaper. She had, and Cherry said, "That was me." The top story in the City-Region Section was about Lemghaili's murder. Later, he stated, "I didn't think I had it in me. I blacked out."
*322 After listening to this recorded conversation, detectives seized Cherry's personal effects-his clothing and cell phone-from the detention center. Blood was observed on Cherry's clothing. A forensic biologist later confirmed the presence of Lemghaili's DNA on Cherry's gloves and jacket.
Cherry called his mother again on March 24, telling her that he was in "so much more trouble now." He told her that the police had seized his cell phone, had found the bullet in the neighbor's apartment, and had spoken with Maudlin. He stated that he had "screwed up real, real bad"; had thrown away his life; and would be old and have gray hair when he got out of jail.
On March 25, after listening to the jail phone calls, Detectives Rob Wilson and Matt Brotherton decided to question Cherry about the Lemghaili shooting. Cherry stated that he had been very intoxicated on drugs and alcohol on Saturday night and claimed not to remember what had happened. He admitted to having gotten into an argument with Bates and shooting his gun in her apartment. Eventually, Cherry began crying and stated, "I seen his face on the news. I don't remember. I woke up, and I was in jail." One of the detectives then asked, "What are we talking about?" and Cherry responded, "Talking about murder."
Cherry maintained throughout the interview that he did not know or remember what had happened that night. At one point, he stated, "I think I tried to walk away without paying for the cab." Later he said, "Because you don't believe me when I tell you stuff that I don't remember, I'm guilty. You're recording. I'm guilty. I swear to god I'm sorry, [inaudible] I deserve whatever happens to me." Several minutes later, after more statements of remorse and complaining that he only had occasional, brief flashes of what had happened that night, Cherry stated, "I would like to even say it was self-defense, but I would be lying and I don't know. I'm telling you now what I know."
At the end of the interview, Cherry was charged with Lemghaili's murder.
Cherry , 458 S.W.3d at 789-92 (footnotes omitted).
On appeal, Cherry continues to argue that he was denied effective assistance of counsel and that the circuit court erred in denying him an evidentiary hearing on his RCr 11.42 motion.[1] His allegations of error include that trial counsel failed to hire a second investigator as well as expert witnesses in the fields of ballistics and toxicology, and that trial counsel was ineffective for failing to advise Cherry regarding a guilty plea.
The applicable standard of review in RCr 11.42 post-conviction actions is well-settled in the Commonwealth. Generally, to establish a claim for ineffective assistance of counsel, a movant must meet the requirements of a two-prong test by proving that: 1) counsel's performance was deficient, and 2) the deficient performance prejudiced the defense . Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added); accord Gall v. Commonwealth , 702 S.W.2d 37 (Ky. 1985), cert. denied , *323 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986). Pursuant to Strickland , the standard for attorney performance is reasonable, effective assistance. The movant must show that his counsel's representation fell below an objective standard of reasonableness, and the movant bears the burden of proof. In doing so, the movant must overcome a strong presumption that counsel's performance was adequate. Jordan v. Commonwealth , 445 S.W.2d 878, 879 (Ky. 1969) ; McKinney v. Commonwealth , 445 S.W.2d 874, 878 (Ky. 1969). Furthermore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland , 466 U.S. at 689, 104 S.Ct. at 2065 (quoting Michel v. Louisiana , 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955) ). "[T]he threshold issue is not whether [appellant]'s attorney was inadequate; rather, it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory ." United States v. Morrow , 977 F.2d 222, 229 (6th Cir. 1992) (emphasis added).
We initially note that each of Cherry's claims is refuted by the record: Trial counsel had in fact retained a second investigator, consulted a toxicology expert, and hired a ballistics expert; and there had been no formal plea offer extended by the Commonwealth. But even if we were to agree with Cherry that his trial counsel was ineffective, he has failed to establish that he was prejudiced by the alleged defective performances. The trial court considered these arguments in its analysis, with which we agree and adopt as if fully set forth herein.
Nor was Cherry entitled to a hearing on his motion:
[A] hearing is required only if there is an issue of fact which cannot be determined on the face of the record. If there is no hearing, then no findings are required.... [T]he record refutes the specific claims which are the bases of appellant's contentions that he should have had a hearing and findings.
Stanford v. Commonwealth , 854 S.W.2d 742, 743-44 (Ky. 1993). Such is the case here.
Having found no error, the order of the Fayette Circuit Court denying Cherry's RCr 11.42 motion is affirmed.
ALL CONCUR.

On July 19, 2017, the Department for Public Advocacy was granted permission to withdraw from representation of Cherry in this post-conviction proceeding pursuant to Kentucky Revised Statute (KRS) 31.110(2)(c) (as "not a proceeding that a reasonable person with adequate means would be willing to bring at his or her own expense"). Cherry's appellate brief has been filed pro se.