# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$ FINAL

## 2018-SC-000422-MR

DATE 10/22/19 JMF

MICHAEL THORNTON            APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 15-CR-001981

COMMONWEALTH OF KENTUCKY          APPELLEE

### MEMORANDUM OPINION OF THE COURT

### AFFIRMING IN PART, REVERSING AND VACATING IN PART AND REMANDING

Michael Thornton was convicted of third-degree assault, two counts of first-degree wanton endangerment, second-degree wanton endangerment, fleeing or evading police, first-degree criminal mischief, receiving stolen property, second-degree escape, theft by failure to make required disposition of property, tampering with a prisoner monitoring device, and being a persistent felony offender in the first degree. He was sentenced to twenty years in prison. Thornton now appeals his conviction as a matter of right, making the following arguments: (1) his convictions for escape and tampering with a prisoner monitoring device violated double jeopardy; (2) his convictions for second-degree wanton endangerment and fleeing or evading police violated double jeopardy; (3) the trial court erred by failing to sever the escape and tampering

charges from the remaining charges; (4) the trial court erred in failing to excuse a juror for cause; and (5) the trial court erred in denying his *Batson* motion.[1] For the reasons set forth below, Thornton's second-degree wanton endangerment conviction is reversed and vacated, and all other convictions are affirmed.

## FACTS AND PROCEDURAL HISTORY

Michael Thornton was subject to home incarceration, an alternative to incarceration where inmates are placed on house arrest and their locations are monitored through an ankle bracelet (anklet). Under the terms of home incarceration, Thornton was not permitted to leave his residence unless he was making a court appearance, reporting to the Louisville Metro Department of Corrections Home Incarceration Unit (HIU), or seeking emergency medical treatment. He was required to stay within the four walls of his residence and could not go outside even if he remained on his property. Thornton acknowledged these conditions in writing. On March 26, 2015, HIU received a notification that Thornton's anklet had been tampered with and that the strap was open. Police located the anklet at its last known location at the intersection of 17th and Lytle Streets and searched for Thornton in the surrounding neighborhood but could not locate him.

Officer Hagan, who was in charge of supervising Thornton while on home incarceration, had information that Thornton was romantically involved with

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Kathryn McIntire, a probationer who reported to the Clifton probation office. Officer Hagan requested that McIntire's probation officer contact Officer Hagan when she was at the probation office and hold her there until she could be interviewed.

On April 2, Thornton dropped McIntire off at the probation office in a silver vehicle. The car driven by Thornton was stolen days prior. McIntire had never seen the vehicle before and did not know how long Thornton had been driving it. He told her that it was his uncle's vehicle. At the probation office, Officer Hagan convinced McIntire to call Thornton and request that he pick her up. Officer Hagan called for backup and learned that Thornton may be driving a stolen vehicle. He then parked in a secluded area behind bushes that provided him with a view of the parking lot.

After Thornton dropped McIntire off, he picked up his cousin Robert and Robert's girlfriend, Pauline, in the stolen vehicle. Thornton returned to the parking lot of the probation office and Officer Hagan determined that it was Thornton driving. Officer Hagan and Detective Joshua Jaynes pulled into the probation office parking lot and put their emergency lights on as Thornton was attempting to leave. Officer Hagan parked nose to nose with Thornton's vehicle and Thornton backed his vehicle down the length of the short parking lot. Officer Hagan and Detective Jaynes exited their vehicles with weapons drawn and gave loud verbal commands to Thornton to stop the vehicle, show his hands and exit the vehicle. Thornton shifted his vehicle from reverse to drive

and the vehicle slowly began to move forward as Detective Jaynes attempted to open Thornton's door.

Thornton then accelerated toward Officer Hagan. Officer Hagan testified that he fired two shots through the windshield as he jumped to avoid being hit. He fired an additional shot through Thornton's window as he drove by.[2] Thornton accelerated down an embankment, across the street and up a hill before turning back toward the street and hitting Officer Keeling's marked police car, pushing it into Officer Hundley's marked police car. This forced Thornton's car to come to a stop and he and his passengers were removed from the vehicle. Both Thornton and Robert had been shot.

The jury found Thornton guilty of third-degree assault of Officer Hagan, two counts of first-degree wanton endangerment as to the passengers in his vehicle, second-degree wanton endangerment as to Officer Keeling, first-degree fleeing or evading police, first-degree criminal mischief (damaging the stolen vehicle), receiving stolen property (the stolen vehicle), second-degree escape, theft by failure to make required disposition of property (abandoning the anklet and charger), and tampering with a prisoner monitoring device. In the penalty phase, the jury found that Thornton is a first-degree persistent felony offender.

---

[2] Officer Hagan testified that he shot two shots through the front windshield and one into the driver's side of the vehicle as Thornton drove by. At trial, a crime scene analyst who performed gunshot reconstruction and trajectory analysis testified that Officer Hagan was in the front of the car when he fired one shot and fired two shots at the driver's side of the vehicle. Where and when the shots were fired is not relevant to this appeal.

4

The trial court sentenced him to an enhanced sentence of twenty years in prison.

## ANALYSIS

### I. The Second-Degree Escape and Tampering With a Prisoner Monitoring Device Convictions Did Not Violate Double Jeopardy.

Thornton acknowledges that this first issue is unpreserved. "[D]ouble jeopardy violations can be addressed as palpable error because the nature of such errors is to create manifest injustice." *Cardine v. Commonwealth*, 283 S.W.3d 641, 652 (Ky. 2009). Kentucky Rule of Criminal Procedure (RCr) 10.26 provides the standard for palpable error review and states:

> [a] palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

The Fifth Amendment to the Kentucky Constitution states that "[n]o person shall, for the same offense, be twice put in jeopardy of his life or limb." Kentucky courts rely on *Blockburger v. United States*, 284 U.S. 299 (1932), to resolve double jeopardy claims. *Dixon v. Commonwealth*, 263 S.W.3d 583, 588 (Ky. 2008). Additionally, Kentucky Revised Statute (KRS) 505.020 outlines the statutory structure for determining whether multiple convictions stemming from the same conduct are permissible.

"The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether

5

each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. We review the escape and tampering statutes to determine whether they contain an element that the other does not. "Pursuant to this test, 'a defendant is put in double jeopardy when he is convicted of two crimes with identical elements, or where one is simply a lesser-included offense of the other.'" *Kiper v. Commonwealth*, 399 S.W.3d 736, 742 (Ky. 2012) (quoting *Turner v. Commonwealth*, 345 S.W.3d 844, 847 (Ky. 2011)).

Under KRS 519.070(1):

> A person is guilty of tampering with a prisoner monitoring device when he or she intentionally alters, disables, deactivates, tampers with, removes, damages, or destroys any device used to facilitate electronic monitoring or supervision of a person who is on probation or parole, or has been ordered to wear a device as a condition of pretrial release.

The statute does not require the defendant to escape or even have an intent to escape in order to be convicted. "A person is guilty of escape in the second degree when he escapes from a detention facility or, being charged with or convicted of a felony, he escapes from custody." KRS 520.030(1). "Escape" is defined as "departure from custody or the detention facility in which a person is held or detained when the departure is unpermitted, or failure to return to custody or detention following temporary leave granted for a specific purpose or for a limited period." KRS 520.010(5). This Court has determined that a person's behavior while in the home incarceration program can constitute second-degree escape. *Weaver v. Commonwealth*, 156 S.W.3d 270, 272 (Ky. 2005).

6

Thornton argues that his act of removing the anklet was not readily distinguishable from the escape. He states that he removed the anklet and left the home incarceration program with the same intention — to escape. He cites to *Kiper*, 399 S.W.3d at 739, where a defendant was convicted of attempted murder and first-degree assault after firing multiple gunshots in rapid succession, then shooting a single shot as he drove away. Kiper argued that the two convictions constituted a double jeopardy violation. *Id.* at 739. The Court held that the convictions violated KRS 505.020(1)(b), which "prohibits a conviction for more than one offense when inconsistent findings of fact are required to establish the commission of the offenses." *Id.* at 741.

The Court based its holding on the specific factual context of Kiper's acts. *Id.* at 744. In order for the jury to convict Kiper of both attempted murder and first-degree assault based on the same course of conduct, they would have to find that Kiper specifically intended to kill the victim, but also intended to cause serious physical injury to the victim — not to kill. *Id.* Citing *Welborn v. Commonwealth*, 157 S.W.3d 608, 612 (Ky. 2005), the Court stated that "for multiple convictions to be proper there must have been a cognizable lapse in his course of conduct during which the defendant could have reflected upon his conduct, if only momentarily, and formed the intent to commit the additional acts." *Kiper*, 399 S.W.3d at 745. The Court distinguished Kiper's case from *Welborn*, in which the defendant shot an officer three separate times and had ample time to pause between each shot, seriously injuring the officer in three separate places. *Welborn*, 157 S.W.3d at 612. Ultimately, the Court

7

determined that Kiper's convictions satisfied the *Blockburger* test, but nevertheless violated the statutory double jeopardy protection in KRS 505.020.

Under the *Blockburger* test, "[a] defendant is put in double jeopardy when he is convicted of two crimes with identical elements, or where one is simply a lesser-included offense of the other." *Turner v. Commonwealth*, 345 S.W.3d 844, 847 (Ky. 2011). In Thornton's case, the crime of escape does not require that the defendant "alter, disable, deactivate, tamper with, remove, damage, or destroy" a prisoner monitoring device. KRS 519.070(1). Tampering with a monitoring device does not require that the defendant depart from custody without permission. KRS 520.030(1). In other words, the two statutory provisions do not have identical elements, and each requires proof of facts that the other does not.

Thornton's conduct and subsequent convictions also satisfy KRS 505.020(1). The statute states that

> (1) [w]hen a single course of conduct of a defendant may establish the commission of more than one offense, *he may be prosecuted for each such offense.* He may not, however, be convicted of more than one offense when:
>> (a) One offense is included in the other, as defined in subsection (2); or
>> (b) Inconsistent findings of fact are required to establish the commission of the offenses; or
>> (c) The offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

(Emphasis supplied). As to KRS 505.020(1)(b), no inconsistent findings were required to establish the offenses, as were present in *Kiper.* 399 S.W.3d at 744.

Thornton submits that the escape and tampering charges occurred in a continuing course of conduct pursuant to KRS 505.020(1)(c) because he removed the anklet, walked out the door, and threw the anklet away three blocks from his residence. He argues that the two charges could only be accomplished with the same intent — to escape home incarceration. While it is true that the tampering and escape charges could be considered part of a continuing course of conduct, Thornton has not shown how either offense was "designed to prohibit a continuing course of conduct" as required by KRS 505.020(1)(c). Regardless, tampering and escape prohibit separate, individual acts and not a course of conduct. Even if these crimes are committed in the same course of conduct, they are separate offenses requiring different conduct. *See Biederman v. Commonwealth,* 434 S.W.3d 40 (Ky. 2014).

Thornton argues that his act of removing the anklet is subsumed in the escape and should be considered a lesser-included offense. But we find that the tampering offense is not included in the separate escape offense pursuant to KRS 505.020(1)(a). In reviewing the requirements to constitute a lesser-included offense, none of the subsections under subsection (2) of KRS 505.020 are applicable here. As determined above, each of the offenses was established by proof of at least one fact unique to each offense. Tampering does not consist of an attempt to commit escape. According to the terms of the home

9

incarceration program, Thornton was not permitted to leave his residence unless he was making a court appearance, reporting to the Louisville Metro Department of Corrections, or seeking emergency medical treatment. He was required to remain within the four walls of his residence and could not go outside, even if he remained on his property. It is conceivable, even if unlikely, that a person on home incarceration can tamper with his anklet without making an escape attempt, thereby giving rise to tampering charges but not escape charges.

While removing the anklet prevented the police from being able to track Thornton, it was not a requirement of the escape conviction, which merely requires a departure from custody. Based on the terms of home incarceration, Thornton arguably could have been charged with escape for simply going into his yard or taking out the trash. Finding that Thornton's convictions for tampering and escape satisfy both the *Blockburger* test and the statutory double jeopardy analysis as prescribed by KRS 505.020, we affirm the convictions.

## II. The Second-Degree Wanton Endangerment and First-Degree Fleeing or Evading Police Convictions Violated Double Jeopardy.

Thornton argues that his convictions for second-degree wanton endangerment as to Officer Keeling and first-degree fleeing or evading police violated double jeopardy. This issue also is not preserved, and thus reviewed for palpable error pursuant to RCr 10.26. As stated above, the *Blockburger* test applies, requiring a determination of "whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304.

10

The provision under which Thornton was convicted of first-degree fleeing or evading police requires:

> while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle, given by a person recognized to be a police officer, and . . . [b]y fleeing or eluding, the person is the cause, or creates a substantial risk, of serious physical injury or death to any person or property[.]

KRS 520.095(1)(a)(4). "A person is guilty of wanton endangerment in the second degree when he wantonly engages in conduct which creates a substantial danger of physical injury to another person." KRS 508.070(1).

This Court considered double jeopardy rights for convictions of first-degree fleeing and evading police and second-degree wanton endangerment in *Brown v. Commonwealth*, 297 S.W.3d 557 (Ky. 2009). The case involved a defendant who circumvented a sobriety checkpoint which resulted in a police chase. *Id.* at 559. The defendant was convicted of fleeing or evading police and second-degree wanton endangerment as to the officers who pursued him as he drove recklessly, attempting to flee. *Id.* This Court concluded that the defendant's rights were violated through the following reasoning:

> First-degree fleeing or evading police contains proof of four facts that second-degree wanton endangerment does not. Specifically, first-degree fleeing or evading police requires proof that the accused was operating a motor vehicle, had intent to elude or flee, disobeyed a police officer's direction to stop, and that the risk of physical injury was serious. Second-degree wanton endangerment requires proof of none of these facts.
> Second-degree wanton endangerment, however, requires proof of no fact beyond first-degree fleeing or evading police. Both provisions are satisfied by proof of wantonly engaging in certain conduct which creates a substantial danger of serious physical injury to another person. For second-degree wanton endangerment, the conduct is general and open-ended; for

11

first-degree fleeing or evading police, the conduct is specified as intentionally fleeing from police while operating a motor vehicle. It follows, therefore, that once the Commonwealth proved the specific conduct required to convict Appellant of first-degree fleeing or evading police, it necessarily proved the general conduct necessary to convict him of second-degree wanton endangerment, too.

Consequently, Appellant's convictions for first-degree fleeing or evading police and second-degree wanton endangerment constitute double jeopardy. . . . This is because the principle of double jeopardy prohibits the Commonwealth from "punish[ing] a single episode as multiple offenses," not from "carv[ing] out of a single criminal episode the most serious offense."

*Id.* at 562-63 (quoting *Commonwealth v. Burge*, 947 S.W.2d 805, 811 (Ky. 1996)). The same reasoning applies here with respect to Thornton's fleeing and evading and the second-degree wanton endangerment of Officer Keeling. The fleeing or evading and second-degree wanton endangerment convictions violate Thornton's right against double jeopardy pursuant to our holding in *Brown. Id.* at 562.

First-degree fleeing or evading police is a felony and second-degree wanton endangerment is a misdemeanor. As stated in *Brown*, "the remedy is to vacate the lesser offense[] of wanton endangerment." *Id.* at 563. The judgment imposed a punishment of ten years in prison for the fleeing and evading conviction,[3] and a $500 fine for the second-degree wanton

---

[3] The initial punishment was five years in prison, but the sentence was enhanced because Thornton was convicted of being a first-degree persistent felony offender.

endangerment conviction. Therefore, Thornton's conviction for second-degree wanton endangerment as to Officer Keeling is reversed and vacated.[4]

### III. The Trial Court Did Not Err in Declining to Sever the Tampering and Escape Charges From the Remaining Charges.

Prior to trial, Thornton filed a motion to sever the escape and tampering charges from the other counts in the indictment, arguing that he would be prejudiced by the jury knowing that he was on home incarceration for a felony when the April 2 incidents at the probation office occurred. The trial court determined that the alleged offenses were inextricably intertwined and a part of the same pattern of conduct. In deciding to deny the motion for severance, the trial court was persuaded by the Commonwealth's argument that Thornton's conduct in attempting to flee from law enforcement authorities was predicated upon his awareness that he was wanted for escaping the home incarceration program.

On appeal, Thornton argues that the trial court abused its discretion in declining to sever the charges. RCr 6.18 allows joinder where "the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." *Debruler v. Commonwealth*, 231 S.W.3d 752, 760 (Ky. 2007). If the "crimes are closely related in character, circumstance, and time" joinder is proper. *Cherry*

---

[4] We note that in the conclusion of this argument in Thornton's brief, he requests that his convictions for second-degree wanton endangerment as to Officers Keeling and Hundley be dismissed. However, the jury instructions and verdict forms indicate that the jury found Thornton not guilty of second-degree wanton endangerment as to Officer Hundley.

13

*v. Commonwealth*, 458 S.W.3d 787, 794 (Ky. 2015). Further, "[a] criminal defendant is not entitled to severance unless he positively shows prior to trial that joinder would be unduly prejudicial." *Cohron v. Commonwealth*, 306 S.W.3d 489, 493 (Ky. 2010).

"The trial court has broad discretion with respect to joinder and will not be overturned in the absence of a showing of prejudice and a clear abuse of discretion." *Id.* The trial court abuses its discretion when it makes a decision that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "If evidence from one of the offenses joined in the indictment would be admissible in a separate trial of the other offenses, the joinder of offenses generally will not be prejudicial." *Cohron*, 306 S.W.3d at 493.

Thornton argues that while a temporal connection between the events exists, the charges arising from his home incarceration escape would not be admissible if the trial court had ordered them tried separately from the April 2 charges occurring at the probation office. He states that the fact that he escaped from home incarceration was not so intertwined with the incident in the parking lot that his status as an escapee was necessary to prove the parking lot crimes.

The Commonwealth counters that every other offense Thornton was charged with was committed in furtherance of his escape. For example, removing the anklet denied police GPS information about his location, making him harder to find, and his actions in the probation office parking lot were

14

intended to extend his escape. We agree with the trial court that the events were so intertwined as to justify joinder of the offenses.

At trial, one of the passengers in Thornton's vehicle during the incidents in the parking lot testified that she was scared and kept asking Thornton to stop the car. Thornton told her that he could not stop and that he was on the run. Thornton likely did not want to stop and submit himself to the police because he knew he had violated the law by tampering with the anklet and escaping from home incarceration. As Thornton cites,

> the required nexus does not arise simply from the proximity of the alleged crimes in time and space, although proximity is certainly relevant, but rather from a "logical" relationship between them, some indication that they arose one from the other or otherwise in the course of a single act or transaction, or that they both arose as parts of a common scheme or plan.

*Peacher v. Commonwealth*, 391 S.W.3d 821, 837 (Ky. 2013). While Thornton had also stolen a vehicle (or at least received a stolen vehicle) in the period between escaping home incarceration and the events in the parking lot, he clearly had a motive or plan for escaping incarceration in the first place and it is likely that the parking lot incidents were in furtherance of that plan, rather than him merely seeking to avoid being caught for stealing the vehicle. Additionally, the Commonwealth argued that Thornton's escape from home incarceration was the reason Officer Hagan was at the probation office in the first place because he was trying to locate Thornton. Officer Hagan was responsible for supervising Thornton and had been searching for him since he escaped on March 26. All the incidents that occurred after the tampering and

15

escape thus can be reasonably said to be part of Thornton's scheme or plan to escape and avoid home incarceration.

Here, evidence used to establish that Thornton tampered with the anklet and left the confines of his home, in violation of the home incarceration terms, was relevant to the other offenses. This evidence was necessary to establish why Officer Hagan was looking for Thornton and why he devised a plan to try to catch Thornton. The evidence also goes to establishing Thornton's motive or intent in committing the other crimes, such as wanton endangerment and assault. As stated in *Cohron*, because the evidence from one offense would be used in a trial for the other offenses, joinder is not prejudicial. 306 S.W.3d at 493. "Additionally, considerations of judicial economy and the efficiency of avoiding multiple trials are reasons for joint trials." *Id.* at 493-94. In Thornton's case, "[s]eparate trials would involve a great deal of duplicate testimony, witnesses, and evidence." *Murray v. Commonwealth*, 399 S.W.3d 398, 406 (Ky. 2013).

Moreover, Thornton failed to establish the requisite prejudice prior to trial. "Because a defendant is prejudiced simply by virtue of being tried at all, we require a defendant to show that he would be 'unfairly prejudiced' by a joinder." *Parker v. Commonwealth*, 291 S.W.3d 647, 656-57 (Ky. 2009). During the hearing on his motion to sever, Thornton argued that the case could be tried without admission of the fact that he was on home incarceration for a felony charge when the other incidents leading to the indictment occurred. While this may be true, Thornton offered little to support his

16

argument for severance, thereby failing to establish the necessary prejudice. This Court has determined that "to be reversible, an erroneous joinder of offenses must be accompanied by 'a showing of prejudice' to the defendant. This showing of prejudice cannot be based on mere speculation, but must be supported by the record." *Hammond v. Commonwealth*, 366 S.W.3d 425, 429 (Ky. 2012) (citations omitted). Given the lack of evidence to support prejudice from trying the charges together, we cannot say that the trial court abused its discretion in denying the motion to sever.

The Commonwealth argues that even if denying severance of the charges was error, it was harmless given that the evidence of the assault against Officer Hagan was overwhelming. In his reply brief, Thornton alleges that the evidence supporting the assault and wanton endangerment convictions was insufficient, and that the Commonwealth ignores evidence presented by Detective Jaynes suggesting that he did not believe he (Jaynes) was in danger during the incidents in the parking lot, and evidence suggesting Thornton was unconscious when the car went down the hill and onto the road. Because we cannot find that the trial court abused its discretion in declining to sever the charges, harmless error analysis is unnecessary. However, even if the evidence presented was contradictory, assessing the credibility of witnesses and determining the weight given to their testimony rests "within the unique province of the jury." *Ross v. Commonwealth*, 531 S.W.3d 471, 477 (Ky. 2017).

17

## IV. The Trial Court Did Not Err in Declining to Excuse a Juror for Cause.

Thornton argues that the trial court erred in declining to excuse a juror for cause. During *voir dire*, Thornton challenged Juror A for cause.[5] Juror A stated that he was a corrections officer whose home was recently broken into. Initially, this juror expressed a grudge against criminals, but after a bench conference with counsel and the trial court, Juror A indicated that he could be impartial. Thornton made a motion to strike Juror A for cause, citing his initial indication of a bias against criminals. The Commonwealth countered stating that nothing Juror A said rose to the level of striking a juror for cause, and highlighted that Juror A seemed to be upset with a specific group of adolescents in his neighborhood that broke into his home. The trial court considered both arguments and concluded that because Juror A stated he could listen to the evidence and make a decision in the case based on what he heard, the motion should be denied.

Thornton states that because the trial court did not strike Juror A for cause, he was forced to use a peremptory challenge. If he had not had to use his peremptory strike on Juror A, he would have used it on Juror B.[6] Juror B

---

[5] In his brief, Thornton identifies these jurors by their seven-digit identification numbers assigned by the trial court. For simplicity, we identify this juror as Juror A, and will identify other jurors later in this opinion as Jurors B, C, and D.

[6] We note that in making his presentation to the trial court, Thornton's counsel mistakenly gave the incorrect juror number for Juror A. Counsel referred to the juror as a male, but the identification number counsel provided was assigned to a female. However, given that Juror A was a corrections officer, and that Thornton identified him as such and referred to the juror as male, we note the error but believe that the trial court and the Commonwealth were aware of the correct juror Thornton was challenging.

made comments about her belief that her daughter "got what she deserved" by being arrested and imprisoned. Thornton now points out that Juror B sat on the jury that ultimately convicted him. He argues that there were reasonable grounds to believe that Juror A was biased, and he should have been struck for cause, thereby allowing him to use a peremptory strike on Juror B.

"When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36(1). "It is elementary that the determination of whether to excuse a prospective juror rests within the sound discretion of the trial judge and ought not to be set aside by a reviewing court unless the error is manifest." *Peters v. Commonwealth*, 505 S.W.2d 764, 765 (Ky. 1974). Therefore, on review the trial court's decision will only be reversed for clear error. *Scruggs v. Commonwealth*, 566 S.W.2d 405, 410 (Ky. 1978).

Thornton cites *McDaniel v. Commonwealth*, 341 S.W.3d 89, 92-93 (Ky. 2011), to state

> the impartiality of a juror manifests itself as a state of mind, and not simply through the juror's responses to questioning . . . . [A] juror may indicate that he or she can be impartial, but may demonstrate a state of mind to disprove that statement "by subsequent comments or demeanor so substantially at odds that it is obvious the [trial court] has abused [its] discretion in deciding the juror is unbiased."

Thornton acknowledges that being a member of law enforcement is not enough to strike a juror for cause, *Mills v. Commonwealth*, 95 S.W.3d 838, 842 (Ky. 2003), but argues that the fact that Juror A's home was broken into four to five months before trial constitutes bias.

The initial comments made by Juror A were concerning. He initially indicated a bias toward all criminals. However, as the trial court explained, the Commonwealth questioned Juror A and discovered the root of his bias, which was directed at the young individuals in his neighborhood that committed the crime. When questioned by the trial court during the bench conference, Juror A indicated that he would give Thornton a "fair deal." Further, he stated that he did not know whether Thornton was guilty or innocent because he had not yet heard the proof. He also explained that he was not leaning toward thinking Thornton was guilty because he had not heard any proof — if the proof indicated he was not guilty then he stated he could find him not guilty.

"Generally, the impartiality of a juror manifests itself as a state of mind, and not simply through the juror's responses to questioning, although that possibility certainly exists." *McDaniel*, 341 S.W.3d at 92. "A trial court's decision whether a juror possessed 'this mental attitude of appropriate indifference' must be reviewed in the totality of circumstances. It is not limited to the juror's response to a 'magic question.'" *Montgomery v. Commonwealth*, 819 S.W.2d 713, 718 (Ky. 1991). While it is true that a juror may indicate an ability to be impartial, they "may demonstrate a state of mind to disprove that statement 'by subsequent comments or demeanor so substantially at odds that it is obvious the [trial court] has abused [its] discretion in deciding the juror is unbiased.'" *McDaniel*, 341 S.W.3d at 92 (quoting *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007)). Here, Juror A's demeanor and subsequent comments did not contradict the several indications that he could be impartial

20

and would give Thornton a "fair deal." Juror A responded to Thornton's, the Commonwealth's and the trial court's various questions directed to any potential bias and all of his answers indicated his ability to be impartial.

Thornton also argues that the juror was unable to consider the full range of penalties: "It is difficult to imagine that a juror who holds a grudge against all criminal defendants would be able to consider and impose a minimum sentence on Michael Thornton, should he believe the evidence warranted it[.]" Thornton then cites *Springer v. Commonwealth*, 998 S.W.2d 439, 456 (Ky. 1999), to support the proposition that jurors that cannot consider a full range of penalties must be excused for cause. However, this is mere speculation. Neither Thornton nor the Commonwealth questioned the juror on that point.

Thornton also points to Juror A's initial comment that he did not agree with what Thornton did, but Juror A immediately continued on to suggest that he did not agree with any criminal act and he is against anyone that breaks the law. Following this statement, the trial court asked Juror A whether he could find Thornton not guilty if the proof was insufficient, noting that at that point in time the court was dealing with mere allegations. Juror A affirmatively stated that he could find Thornton not guilty if the proof did not establish his guilt.

Thornton argues that Juror A's answers to the "magic questions" asked by the trial court do not render him impartial. *Montgomery*, 819 S.W.2d at 717. But the trial court must determine a juror's impartiality based on the totality of the circumstances. *Shane*, 243 S.W.3d at 338. Most people likely

21

harbor some type of bad feelings or thoughts about criminals. However, Juror A made it clear that he could consider the evidence and find Thornton not guilty based on the proof presented. When reviewing the totality of the circumstances and the trial court's questions to Juror A, we cannot say that the trial court's decision was clearly erroneous.

## V. The Trial Court Did Not Err in Denying Thornton's *Batson* Motion.

The venire started with eight African-American jurors and three of those jurors served on the panel that actually heard the case. Of the original eight, two were excused for hardship. Of the remaining six, Thornton struck one and the Commonwealth struck two, Jurors C and D, the focus of Thornton's *Batson* challenge.

After the parties exercised their peremptory challenges, Thornton asked the Commonwealth for its race-neutral reasons for striking Jurors C and D. The Commonwealth provided reasons, and the trial court was satisfied that the explanations for removing the two jurors were race-neutral and so overruled the *Batson* challenge. Thornton argues that the trial court erred in denying his *Batson* motion regarding Jurors C and D.

In *Batson*, the United States Supreme Court set forth a three-step process for determining whether peremptory strikes were used to strike jurors on the basis of race in violation of the Equal Protection Clause:

> First, the defendant must make a prima facie showing of racial bias for the peremptory challenge. Second, if the requisite showing has been made, the burden shifts to the Commonwealth to articulate clear and reasonably specific race-neutral reasons for its use of a peremptory challenge. While

22

the reasons need not rise to the level justifying a challenge for cause, self-serving explanations based on intuition or disclaimer of discriminatory motive are insufficient. Finally, the trial court has the duty to evaluate the credibility of the proffered reasons and determine if the defendant has established purposeful discrimination. A judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact.

*Gamble v. Commonwealth*, 68 S.W.3d 367, 371 (Ky. 2002) (internal quotations and citations omitted). A trial court's denial of a *Batson* motion is reviewed for clear error. *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000).

This Court has determined that once the Commonwealth offers race-neutral reasons for the peremptory strike and the trial court has ruled on the discrimination issue the first step in the analysis — the defendant's *prima facie* showing of racial bias — is moot. *Gamble*, 68 S.W.3d at 371. Here the Commonwealth provided race-neutral reasons for striking the jurors subject to the *Batson* motion, rendering the first prong of the analysis moot.

The second prong of the test requires the Commonwealth to provide "clear and reasonably specific" race-neutral reasons for the peremptory strikes. *Id.* The Commonwealth stated that Juror C had been sleeping during the entire *voir dire*, and Juror D was "nodding off and acting disinterested," and had "rolled her eyes on a couple of occasions." The second step of the *Batson* analysis does not require the Commonwealth's reasons for exercising a peremptory strike to be persuasive or plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). This step is a "fairly low bar for the Commonwealth to meet." *Mash v. Commonwealth*, 376 S.W.3d 548, 555 (Ky. 2012). Here the facial

23

validity of the Commonwealth's explanation is assessed and, unless discriminatory intent is inherent in the justification for the strike, the proffered reasons will be deemed race-neutral. Because there is no discriminatory intent inherent in the Commonwealth's explanations for striking Jurors C and D, the second prong of the *Batson* analysis is satisfied. *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

In the third step of the *Batson* analysis, the burden shifts back to the party challenging the strike to prove "purposeful discrimination." *Hernandez*, 500 U.S. at 359. The trial court must determine whether the Commonwealth's reasons behind exercising the strikes were merely a pretext for racial discrimination. *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky. 2007). This step requires the trial court to assess the credibility and demeanor of the attorneys. *Commonwealth v. Coker*, 241 S.W.3d 305, 308 (Ky. 2007). Since this is comparable to a finding of fact, the trial court must be afforded great deference. *Chatman*, 241 S.W.3d at 804.

Thornton argues that the Commonwealth's reasons for striking Juror C and D based on their inattentiveness were not valid race-neutral reasons, citing *Washington*, 34 S.W.3d at 376. In *Washington*, this Court expressed concern over the assertion that a juror appeared inattentive, given that no questions were directed to that juror during *voir dire*. 34 S.W.3d at 379. Thornton points out that the Commonwealth addressed no questions to either Jurors C or D and specifically did not ask about their apparent inattentiveness, boredom, or sleeping. However, during *voir dire*, the Commonwealth was questioning the

24

panel as a whole. Inattentiveness during general questioning, especially sleeping, is an adequate reason for exercising a strike.

"[I]n the absence of exceptional circumstances," appellate courts should defer to the trial court in the third step of the analysis. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Here, the trial court determined that the Commonwealth's justifications for exercising the juror strikes were race-neutral and satisfactory. Because Thornton has failed to prove purposeful discrimination we conclude that the trial court's denial of the *Batson* challenge was not error.

## CONCLUSION

For the foregoing reasons, we reverse and vacate Thornton's second-degree wanton endangerment conviction and affirm all other convictions. Accordingly, we remand this case to the trial court for entry of a new judgment consistent with this Opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph A. Newberg, II
Assistant Attorney General
Office of Criminal Appeals