# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: APRIL 24, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0537-MR

RICHARD GRAY                                                APPELLANT

|  |  |  |
|---|---|---|
| V. | ON APPEAL FROM NELSON CIRCUIT COURT<br>HONORABLE JOSEPH GUINAN BALLARD, JUDGE<br>NO. 22-CR-00092 | |

COMMONWEALTH OF KENTUCKY                                APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Richard Gray was convicted of murder and second-degree unlawful imprisonment. He now appeals his convictions and resulting sentence of life imprisonment as a matter of right. After review, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In February 2022, Gray was living with Tabitha Murray in her Bardstown, Kentucky, home. Also residing in the home were Gray's three sons from a previous relationship who were ten, nine, and six years old; Tabitha's six-year-old daughter from a previous relationship, Jane;[1] and a one-year-old

---

[1] This Opinion will utilize a pseudonym to identify Jane in order to protect her anonymity.

male infant that Gray and Tabitha shared in common. Gray and his three older sons moved in with Tabitha, Jane, and the baby in late December 2021.

At 5:00 p.m. on February 4, 2022, Tabitha's next-door neighbor went outside to shovel snow off her sidewalk and noticed three little boys were outside standing next to Tabitha's Jeep holding black trash bags. The Jeep was still there at 5:15 p.m. when the neighbor went back into her house for the evening. At 5:26 p.m. Jane called 911 and told the operator that her daddy,[2] Richard Gray, had killed her mommy, Tabitha Murray, with a pan and left. Jane gave the operator her home address, and Sergeant Jeremy Cauley and Officer Cody Clark with the Bardstown Police Department immediately responded. Sgt. Cauley first encountered Jane standing on the curb in front of her home. He instructed Ofc. Clark to place her in his cruiser while they cleared the house. The officers then entered the home and found thirty-three-year-old Tabitha lying on her back in the kitchen floor in front of the stove, she was deceased. It appeared as though she had been killed while cooking dinner as there was a saucepan of food on the stove and a saucepan lid on the floor. All of the lights in the house had been turned off, there were no signs of forced entry or a struggle, and no one else was found inside.

Of note, the officers also observed that a chair from a children's table and chair set was in the closet of the boys' bedroom on the opposite end of the home from the kitchen; that the bed in the master bedroom had a pile of

---

[2] Although Gray was not Jane's biological father, she consistently referred to him as "daddy."

clothes, an overturned clothes hamper, and a bag of diapers on it; that there was an open box of thirty gallon black trash bags on the children's table in the boys' bedroom; and that there was a charging cord lying in the floor in the hallway. Ofc. Clark also observed footprints in the snow behind the house.

Tabitha's autopsy revealed that she had been shot three times in the head. The forensic pathologist that conducted her autopsy opined that she had been shot once in the back of the head from less than two inches away based on the presence of soot and stippling around the entrance wound. He further concluded she had been shot twice in her left cheek between eighteen and twenty-four inches away based on the presence of some stippling but no soot. Three spent 9mm shell casings were found at the scene: two were on Tabitha's lap and one was beneath her body.

After Sgt. Cauley cleared the home and confirmed Tabitha was deceased, he spoke with Jane. She reiterated that her father's name was Richard Gray and that he killed Tabitha with a pan. She further stated that Gray had tied her (Jane) to a chair at some point with a belt prior to leaving while gesturing to a belt she had draped around her torso like a sash. Jane told the officers that Gray left the scene in Tabitha's red Jeep, although she was unsure of the vehicle's model, and that he had taken the other four children with him. She told the officer that Gray had also killed her baby brother which, fortunately, was later determined to be incorrect. She stated to Sgt. Cauley:

> **Jane:** And when my mom first came home, he told me to go, my dad told me to go in my brothers' room and sit down, and then I heard loud banging, and then he told me to go in my mommy and his room and then I heard a loud thump and I heard [the baby]

3

crying. . . and then he left me, and then when I look again in the kitchen I saw my mom on the floor dead, blood was all over the floor.

**Cauley:** Was that today?  Yeah?  Were they arguing?


**Jane:** No.

**Cauley:** They weren't arguing?

**Jane:** No.  He hit her, he hit her with a pan.

**Cauley:** Did you see that?

**Jane:** No.  I just heard it. . . . He just hit her with a pan for no reason, I don't know why.  When he first come in here he told me to go in my brothers' room and sit down, and when I went in my brothers' room to sit down I heard my little brother crying, and then he was packing bags and then he put them in the trunk, and then he left, and then he told me to go in that room, and then when I went out of the room, I saw him, I looked out the window and then his car was gone, my mommy's car was gone.  And I told him that he was going to kill me, and he said no.  And I said where's my mommy and he said she's taking a little rest and then when I went in the kitchen, she was dead.

Based on the information Jane provided the officers issued an AMBER[3] Alert and a BOLO[4] for Tabitha's Jeep, which they determined was a maroon 2014 Jeep Patriot.

Approximately three and a half hours after Jane called 911, police officers in Mount Vernon, Illinois,[5] responded to a call about a fight in progress at a local gas station.  When Officer Shylah Kunick arrived, she observed a

---

[3] America's Missing: Broadcast Emergency Response.

[4] Be on the lookout.

[5] Mount Vernon, Illinois, is approximately three and a half hours away from Bardstown, Kentucky.

white male on top of Gray. Upon seeing her, the white male immediately got up and was calm and cooperative, but Gray was not. He refused to stand still or follow her commands and kept trying to pull away from her. Officer Zachary Jines arrived at the scene shortly after Ofc. Kunick and assisted her in subduing Gray who continued to behave erratically, yell, and physically resist them. They eventually handcuffed Gray and placed him in the back of a cruiser. The officers learned that the altercation between Gray and the white male was caused by Gray borrowing the man's cellphone and refusing to give it back.

When Gray was apprehended, he was still traveling in Tabitha's Jeep with his four children, all of whom were physically unharmed. Gray told the officers his name was Rasheed Abdul Hawk, but the children informed the officers of his real name. Soon thereafter, the officers ran the Jeep's license plate and discovered the AMBER Alert that had been issued. The officers then patted Gray down and discovered he had a semiautomatic pistol tucked inside the shorts he was wearing under his pants. Also on his person, he had a debit/credit card that belonged to Tabitha and a Post-it Note with handwritten directions to St. Louis, Missouri on it. The trunk of the Jeep contained several large black trash bags full of clothes.

The pistol the officers recovered from Gray, a SCCY model CPX-2 9mm Luger, was registered to Tabitha but she had reported it as stolen to the Bardstown Police Department seven months earlier in July 2021. Lawrence Pilcher, a Kentucky State Police firearms and toolmark identification expert

5

concluded that the gun found on Gray's person was the same gun that fired each of the three spent shell casings found around Tabitha's body. Pilcher reached this conclusion by taking a control bullet (Fiocchi 9mm Luger) of the same make and model as the bullets used to kill Tabitha and fired it out of the gun. Then, using a microscope, he made visual comparisons between the marks left on that shell casing to the marks left on the three shell casings found near Tabitha's body. Pilcher acknowledged on cross that he could not say Tabitha's gun fired the bullets to the exclusion of every other gun in the world, and that his testing consisted of an entirely subjective visual inspection.

Jane, who was eight years old when she testified at Gray's trial, provided testimony that was largely consistent with what she told Sgt. Cauley on the day of the murder, but it did have some inconsistencies. She testified that on the day of the murder Gray told the children they were going camping and to get their clothes together and told Jane to go to a back room. Jane testified that Gray tied her up but claimed that he only used a cord and did not use a belt. She maintained that she did not see Gray kill Tabitha and instead only heard something loud that sounded like a pan. On cross-examination she acknowledged that her bindings were not tight, they did not hurt, and she was able to free herself from being tied up. It was at that point she walked in the kitchen and saw her mom on the kitchen floor and called 911. She said she thought she heard "a little bit" of arguing between Tabitha and Gray before she heard "the loud noise."

6

Gray did not present any evidence in his defense. In both opening statement and closing argument, Gray's counsel urged the jury to set aside their emotional reactions to the case and focus on the evidence that the Commonwealth failed to present and the inconsistencies in and incorrect portions of Jane's testimony. The defense highlighted that Jane incorrectly told the officers that Gray killed Tabitha with a pan and that Gray also killed her infant brother. Further, she told officers at the scene that Gray had tied her up with a belt and that she did not hear her mother and Gray arguing, but she testified at trial Gray did not use a belt to tie her up that that she thought she heard some arguing prior to Tabitha's death. The defense also emphasized that the Commonwealth failed to prove any potential motive Gray might have had to commit the murder, and that it never provided an explanation for the footprints in the snow Ofc. Clark found behind Tabitha's home. The defense argued that Gray's behavior at the Mt. Vernon, Illinois, gas station prior to his arrest should not be considered evidence of his guilt, and it attempted to explain away the gun found on Gray's person by asserting that it was stolen several months before Gray moved in with Tabitha.

Based on the foregoing evidence, the jury was instructed on murder, first-degree unlawful imprisonment, and second-degree unlawful imprisonment. It found Gray guilty of murder and second-degree unlawful imprisonment and, consistent with its recommendation, the circuit court imposed a life sentence for the murder conviction and a one-year sentence and $500 fine for the second-degree unlawful imprisonment conviction.

Additional facts are discussed below as necessary.

## II.   ANALYSIS

### A. The circuit court did not err by admitting the dash camera footage of Gray being detained.

Ofc. Jines, one of the Illinois officers that arrested Gray, had a dash camera in his cruiser. That camera recorded an approximately thirteen-minute video of Gray being detained prior to his arrest. In the video, which was at all times pointed at the gas station's entrance, Gray was physically removed from the gas station by Ofc. Jines. Gray then struggled with him for several minutes. Throughout the interaction, Gray was yelling and screaming various things that cannot be discerned from the record before us[6] and refusing to follow the officers' commands. The video then showed officers putting Gray in handcuffs and walking him toward a cruiser. After Gray was placed in the back of one of the officer's vehicles, he continued to yell for several minutes. When he eventually calmed down one of the officers began asking him questions periodically, but his answers were mostly inaudible. Toward the end of the video, Gray told an officer his name was Rasheed Abdul Hawk.

---

[6] The dash camera footage was played into the record at trial, but a separate copy was not provided on appeal. We are therefore limited by what can be discerned from the video record. Whenever Gray yells or screams something, the audio of the video record becomes distorted to such an extent that whatever he was saying becomes inaudible.

On September 15, 2023, the Commonwealth filed notice pursuant to KRE[7] 404(c)[8] of its intention "to introduce testimony, exhibits, and evidence regarding [Gray's] flight from the murder, travelling to Illinois. . . and behavior, statements, and arrest at the truck stop in Illinois[.]" The Commonwealth asserted that proof of a defendant's flight to evade capture has long been admissible as proof of guilt, citing *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky. 2003) ("[P]roof of flight to elude capture or to prevent discovery is admissible because 'flight is always some evidence of a sense of guilt.'").

Gray filed a response objecting. He argued that "those pieces of evidence do not meet the KRE 404(b) exception as claimed by the Commonwealth[,]" and that his actions at the truck stop had "no probative value regarding [Gray's] alleged motivations concerning either of the charges leveled against him." At a pre-trial hearing on September 21, 2023, the defense added to its argument that the video depicted "poor behavior that's going to make the jury think poorly of [Gray] and has nothing to do with the charged crime." The circuit court ruled to admit the video, reasoning that it depicted events that occurred only a few hours after the shooting, it demonstrated Gray's mental state close in time to the shooting, and it was the best evidence of what occurred during Gray's arrest. However, the court explicitly directed the Commonwealth not to

---

[7] Kentucky Rule of Evidence.

[8] KRE 404(c) mandates that "[i]n a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence."

elicit any evidence of the crimes he was charged with in Illinois due to the incident. At trial, both Ofc. Kunick and Ofc. Jines testified that Gray was agitated and uncooperative during their interactions with him, and the dash camera footage was played during Ofc. Jines' direct examination by the Commonwealth.

Before this Court, Gray argues that the circuit court reversibly erred by admitting the dash camera footage because it was other bad act evidence that did not satisfy either KRE 404(b) exception and it did not satisfy the *Bell* test for determining the admissibility of other bad act evidence. *Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994). The Commonwealth responds, primarily relying on *Cherry v. Commonwealth*, 458 S.W.3d 787 (Ky. 2015), that the video depicted behavior Gray engaged in while in the process of fleeing from a crime and therefore all facts and circumstances demonstrating he was evading or attempting to resist arrest were competent evidence against him.

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. *See, e.g., Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011). This Court will accordingly uphold the circuit court's ruling to admit the dash camera footage unless we conclude its decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

Pursuant to KRE 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

10

conformity therewith[.]" However, such evidence may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). The oft applied *Bell* test for "determining the admissibility of other crimes evidence" asks: (1) whether the other crimes evidence is relevant for some purpose other than to prove the defendant's criminal disposition; (2) whether the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its admission into evidence; and (3) whether the other crimes evidence's potential for prejudice substantially outweigh its probative value. 875 S.W.2d at 889-91.

Here, the dash camera footage of Gray's arrest was certainly relevant for a purpose other than proving his criminal disposition. Namely, as an expression of his sense of guilt. *See Cherry*, 458 S.W.3d at 974 (quoting *Rodriguez,* 107 S.W.3d at 218). In *Cherry,* the Appellant John Cherry had committed numerous offenses over the course of five hours following a multiple day "bender" during which he consumed copious amounts of drugs. 458 S.W.3d at 790-93. At 3 a.m. Cherry fatally shot a taxi driver. *Id.* at 790. Within an hour and a half of the shooting he went to a friend's apartment and then to his girlfriend's apartment. *Id.* He and his girlfriend got into an argument, he fired a gun at her, and the bullet went into a neighboring apartment. *Id.* at 790-91. Fearing the police would come, Cherry and his girlfriend left her apartment. *Id.* at 791. She then abandoned him at a gas station, and Cherry forced a stranger to drive him to Walmart at gunpoint. *Id.*

11

After resisting arrest, Cherry was ultimately apprehended by police approximately five hours after he initially shot the taxi driver.  *Id.*

Cherry argued on appeal that the trial court erred by denying his motion to sever the murder charge from his numerous other charges.  *Id.* at 793.  One of the primary considerations "in assessing whether undue prejudice resulted from the joinder of offenses is 'whether evidence necessary to prove each offense would have been admissible in a separate trial of the other[]'" under KRE 404(b).  *Id.* (quoting *Roark v. Commonwealth*, 90 S.W.3d 24, 28 (Ky. 2002)).  The *Cherry* Court held that "the evidence of the events relating to the wanton endangerment, unlawful imprisonment, and drug charges would have been admissible at a separate murder trial for an 'other purpose' under KRE 404(b)—namely, as 'an expression of a sense of guilt.'"  458 S.W.3d at 974 (quoting *Rodriguez*, 107 S.W.3d at 218).  It reasoned that each of Cherry's actions following the murder of the taxi driver amounted "to evidence of flight from the murder scene" and that

> evidence of a defendant's flight or attempts to avoid arrest [have] long been admissible under Kentucky law "to show a sense of guilt because flight is always some evidence of a sense of guilt." *Doneghy v. Commonwealth*, 410 S.W.3d 95 (Ky. 2013) (citation and internal quotation marks omitted).  Indeed, "where one after the commission of a crime flees from a place, and either evades or actively resists arrest, all facts and circumstances showing the evasion or resistance of arrest even though they disclose the commission of another crime, are competent against him upon a trial for the first offense." *Fallis v. Commonwealth*, 197 Ky. 313, 247 S.W. 22, 24 (Ky. 1923).

458 S.W.3d at 975.

Thus, the dash camera footage depicting Gray's detainment prior to arrest was admissible under KRE 404(b)(1) as evidence of both his flight from the murder scene, his attempt to avoid arrest, and offering a false identity are admissible as evidence of his guilty conscience. The video was recorded three and a half hours after the murder in a location three and a half hours away from where the murder occurred, which tends to prove Gray fled the crime scene immediately after shooting Tabitha. The video demonstrated Gray's high state of agitation upon coming into contact with law enforcement and depicted him physically struggling with a police officer for several minutes while repeatedly refusing to follow commands. Finally, it recorded Gray giving the officers a false name. All of this amounted to evidence of flight from the murder scene and attempts to avoid arrest, and the first prong of the *Bell* test is satisfied.

As for the second prong—whether the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its admission into evidence—there was no dispute that the man in the dash camera video was Gray, and he concedes in his brief to this Court that this element of the *Bell* test was met.

That leaves the third and final prong: whether the video's probative value was substantially outweighed by the risk of undue prejudice. Gray contends that the video had a low probative value because it was recorded after the murder and unlawful imprisonment occurred and therefore did not materially bear on an element of his charged offenses or another material fact in dispute.

13

Rather, he argues, it was solely meant to show him behaving badly in order to turn the jury against him. For the reasons already discussed, we disagree with Gray regarding the probative value of the video. As it depicted him in active flight from a murder scene and his attempts to avoid arrest, it had a high probative value at least in part as evidence of his guilty conscience. And, while some amount of prejudice to Gray would have naturally resulted from the video, we cannot conclude the prejudice would have been undue. Undue prejudice "generally refers to two distinct risks that might occur due to the introduction of evidence: '(1) risk of an emotional response that inflames passions, generates sympathy, or arouses hostility; and (2) risk that the evidence will be used for an improper purpose.'" *See, e.g., Dixon v. Commonwealth*, 149 S.W.3d 426, 431 (Ky. 2004). We discern no reason to conclude that the arrest video's probative value was substantially outweighed by either of those potential risks. While Gray behaves poorly in the video, his behavior is by no means outrageous and, as discussed, it was used as evidence of Gray's sense of guilt and thus was not for an improper purpose.

As the circuit court's admission of the arrest video was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles[,]" we affirm. *English*, 993 S.W.2d at 945.

**B. The circuit court did not err by limiting Gray's closing argument.**

When Gray was apprehended, there was a letter to Gray from the Nelson County Attorney's Office on top of the other items in the Jeep's center console. The letter informed Gray that Tabitha was seeking child support from him. It

14

was dated October 26, 2021, but Gray did not receive it until January 2022 because it had originally been sent to an address he had in Texas and had to be rerouted to Tabitha's address in Kentucky.

In its KRE 404(c) notice, the Commonwealth gave notice of its intent to introduce evidence "regarding the initiation by the victim of a child support inquiry/proceeding against [Gray], including documentary notices mailed contemporaneously in time, as proof of at least one element of motive, intent, and knowledge." Gray's response objected to the evidence on the grounds that there had been "no indication that this was something the defendant and the decedent discussed or argued about[,]" and that there was "no evidence that this might have been a motive for any alleged actions of the Defendant and thus should not be admissible."

While the circuit court agreed with the defense that the letter itself was the only proof the Commonwealth had that a dispute between Gray and Tabitha over child support was a potential motive, it nevertheless granted the Commonwealth's request to admit the letter. Pursuant to that ruling, in the Commonwealth's opening statement, as it was detailing the items found on Gray's person at the time of his arrest, it stated: "And right on top, in the car, were papers from the Nelson County Attorney's Office where the victim was demanding child support from him."

Later, before the lead detective testified, defense counsel asked to approach the bench. The defense renewed its objection to the child support letter and presented an agreed order it had found, signed by both Tabitha and

15

Gray, stating that Gray's current child support obligation to Tabitha was terminated and that Tabitha was waiving entitlement to what she was owed in arrears. This meant that Gray owed nothing to Tabitha but still owed $2,100 to the Commonwealth. Based on this new information, the circuit court sustained the defense's objection and instructed the Commonwealth not to discuss the child support obligation letter. The Commonwealth complied with that instruction for the remainder of the trial. However, during Gray's closing argument, as counsel was discussing what it asserted were the "missing pieces" from the Commonwealth's case, she argued:

> Let's talk about another missing puzzle piece, which is motive. The "why" that this happened. We don't have that, we don't have that. There was no testimony about a big argument, there was no testimony of any evidence of a disagreement. The Commonwealth told you in opening yesterday that there would be evidence of Tabitha demanding child support and presenting that as a potential motive but—

Defense counsel was cut off by the Commonwealth's objection before she could finish her argument that the Commonwealth failed to present the child support letter it referenced in opening statements. During a side bench the Commonwealth argued that Gray received a favorable ruling on the issue of the child support letter and was attempting to use that ruling against the Commonwealth. The circuit court sustained the Commonwealth's objection, noting that at the time the Commonwealth discussed the evidence in opening, the court had ruled that it would be admissible. The court instructed defense counsel to move on. When counsel asked if she was going to be able to address

16

the issue, the court responded that she already had and that it would not admonish the jury otherwise.

Before this Court, Gray asserts that because the Commonwealth was permitted to imply during opening statements that a potential motive for the murder was a dispute over child support, he should have been allowed to highlight the fact that the Commonwealth failed to offer that evidence during his closing argument. Citing *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987), he contends he should have been permitted to comment on the falsity of the Commonwealth's position and the circuit court's refusal to allow him to do so deprived him of a fair trial. The Commonwealth responds that this issue is unpreserved because Gray was able to remark on the fact that the Commonwealth did not present evidence of the child support letter, and the circuit court allowed that argument to stand without admonishment. The Commonwealth further argues that, at any rate, pursuant to *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002), excluded evidence cannot be discussed during closing argument and Gray has not demonstrated any prejudice resulted from the circuit court's ruling.

As a threshold matter, we disagree with the Commonwealth's contention that this issue is unpreserved. Ostensibly, the arguments that Gray wanted to make in closing were that the Commonwealth told the jury in opening it would present evidence of a letter from Tabitha demanding child support from Gray, that the Commonwealth was implying that the child support obligation was a potential motive for the murder, and that the Commonwealth failed to ever

17

produce that evidence. Defense counsel was never able to fully articulate that argument due to the Commonwealth's objection. The defense then made it clear to the circuit court that it wanted to make that argument, and the court denied its request. We consequently consider this argument to be preserved, *see* RCr[9] 9.22, and will affirm the circuit court's ruling unless we determine it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

In *Slaughter*, relied upon by Gray, the Appellant challenged the Commonwealth's closing arguments which criticized the defense "for presenting a 'great octopus' defense[,]" accusing defense counsel "of pulling a 'scam[,]'" and questioning "the sharpness of counsel." 744 S.W.2d at 412. This Court rejected the defendant's argument, holding: "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position. We find that the remarks referred to here were well within the proper bounds of a closing argument and certainly did not affect the outcome of the trial." *Id*. Gray argues pursuant to *Slaughter* that, because the prosecution "may comment as to the falsity of a defense position[,]" he should have been permitted to comment on the falsity of the Commonwealth's position as it related to the child support letter.

Significantly, the only statement the Commonwealth ever made regarding the child support letter during the entirety of the trial was: "And right on top,

---

[9] Kentucky Rule of Criminal Procedure.

18

in the car, were papers from the Nelson County Attorney's Office where the victim was demanding child support from him." After making this statement in opening, the Commonwealth moved on to a different topic and it never explicitly asserted that a child support dispute was Gray's motive for committing the murder. And, due to the circuit court's subsequent ruling to exclude the letter, the Commonwealth never introduced any evidence regarding the letter or a child support obligation in general, nor did it argue in closing that the dispute over child support was a potential motive.

Considering that the Commonwealth only made one fleeting reference to the child support letter during opening statements based on the circuit court's initial ruling on its admissibility; that the Commonwealth never asserted child support was the motive;[10] and the "elementary" fact that "evidence that has been excluded by the trial judge cannot be referred to in closing argument[,]" *Barnes*, 91 S.W.3d at 569 (addressing the Commonwealth's repeated references to the O.J. Simpson trial after the trial court sustained the defendant's objection regarding any reference to it) (citing *Mack v. Commonwealth*, 860 S.W.2d 275, 276–77 (Ky. 1993)); *Moore v. Commonwealth*, 634 S.W.2d 426, 438 (Ky. 1982); *Nolan v. Commonwealth*, 87 S.W.2d 946, 950 (Ky. 1936), we cannot hold that the circuit court's decision to preclude defense counsel from

---

[10] Indeed, the Commonwealth was under no obligation to prove a motive as it is "not an element of a criminal prosecution." *McGuire v. Commonwealth*, 368 S.W.3d 100, 110 (Ky. 2012).

addressing the Commonwealth's failure to present the letter in closing was an abuse of discretion and affirm.

## C. Gray waived any argument that the first portion of Sgt. Cauley's body camera footage was admitted in error, and the circuit court did not err by admitting the second video from Sgt. Cauley's body camera footage.

Gray's next assertion of error concerns two clips from Sgt. Cauley's body camera footage, which was recorded in twenty-nine-minute segments. Prior to the first twenty-nine minute video being played at trial, Sgt. Cauley authenticated it and the Commonwealth asked to introduce it into evidence; the following exchange then occurred:

**Court:** Alright any—are you looking to introduce the whole thing?

**CW:**[11] Yes, judge.

**Court:** Any objection?

**Defense:** No, sir.

**Court:** Alright, I'll show the body cam footage is introduced as [Commonwealth's] Exhibit 4.

That twenty-nine-minute clip depicted Sgt. Cauley first encountering Jane standing on the sidewalk outside of her home. It then showed him clearing the house and discovering Tabitha's body. For the remainder of the video, Sgt. Cauley went between managing the crime scene, relaying information to dispatch and other officers, and sitting with Jane in a cruiser trying to keep her occupied and calm. During this video, the only information Jane relayed to Sgt. Cauley about the crime was that Gray killed her mom and left the scene in

---

[11] Commonwealth.

20

her red Jeep; that Gray also killed her baby brother and took him when he left; and that Gray tied Jane up with a belt and told her he would be back.

After the first twenty-nine-minute body camera video was played, the Commonwealth requested that, in lieu of playing a second twenty-nine-minute body camera video, it be permitted to play just a two minute and forty-five second clip from the second video. Defense counsel objected to the clip being played on the grounds that it contained several testimonial statements from Jane and that those kinds of descriptions should come in exclusively through witness testimony. Noting the age of the witness and the fact that she had already provided some inconsistent testimony,[12] the circuit court allowed the Commonwealth to play the clip. It is during this clip that Jane provided her narrative statements to Sgt. Cauley about what occurred that are quoted in Section I of this Opinion.

Before this Court, Gray argues that both the first twenty-nine-minute video and the second two minute and forty-five second clip were admitted in error. However, Gray waived any entitlement to argue that the first video was admitted in error. As noted above, prior to the video being played, the circuit court asked the defense if it had any objection to the video, and it responded it did not. Gray therefore explicitly waived any objection to the admission of that video and the alleged error is not subject to our review. *See, e.g., Tackett v. Commonwealth*, 445 S.W.3d 20, 29 (Ky. 2014).

---

[12] Jane was the first witness to testify in the Commonwealth's case-in-chief.

21

And, while Gray did object to the second, shorter clip, he did so on different grounds than he argues to this Court. Before the circuit court, Gray argued that the second clip should not be admitted because it contained testimonial statements that the Commonwealth should be required to elicit via questioning. Before this Court, Gray argues that the clip was unnecessarily cumulative and unduly prejudicial. Thus, as Gray fed one can of worms to the circuit court and attempts to feed this Court a different can of worms, his argument is unpreserved. *See Henson v. Commonwealth*, 20 S.W.3d 466, 470 (Ky. 1999). Nevertheless, he requested palpable error review pursuant to RCr 10.26.[13]

> For an error to be palpable, it must be easily perceptible, plain, obvious and readily noticeable. A palpable error "must involve prejudice more egregious than that occurring in reversible error[.] A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable."

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (quoting *Ernst v. Commonwealth*, 160 S.W.3d 744 (Ky. 2005) *overruled on other grounds by Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018)).

---

[13] RCr 10.26 provides: "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

Gray asserts that the video violated KRE 403's prohibition against the needless presentation of cumulative evidence and the general prohibition against the Commonwealth presenting evidence solely to engender sympathy for the victim embodied in cases like *Hunt v. Commonwealth,* 304 S.W.3d 15 (Ky. 2009). KRE 403 directs that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . needless presentation of cumulative evidence."

During the first clip, to which Gray waived any objection, Sgt. Cauley intermittently checked on Jane while fulfilling his other duties at the scene. Across those sporadic conversations, the only information Jane conveyed about the crimes was that her father's name was Richard Gray, that her mother's name is Tabitha Murray, and that her father killed her mother by hitting her with a pan. Also during those conversations, Jane told Sgt. Cauley that Gray tied her to a chair using a belt before leaving the scene in Tabitha's Jeep and that he killed the baby and took him when he left. In the second clip, to which Gray objected, Jane explained more details of the crime albeit with no explanation of the particular timing of the events. Jane stated that when Tabitha came home, Gray told Jane to go into her brothers' room. Then, at unspecified points: Jane heard loud banging, heard a loud thump, and heard the baby crying; Gray packed bags and put them in the trunk of Tabitha's Jeep; Jane asked Gray if he was going to kill her and he responded "no"; and Jane asked Gray where Tabitha was to which he responded she was taking a little rest. Jane further told Sgt. Cauley that Tabitha and Gray had not been

23

fighting that day, that she did not see Gray kill Tabitha, and that she found her mother dead in the kitchen after Gray left in Tabitha's vehicle.

Thus, other than repeating the fact that Gray killed Tabitha, the second video was not duplicative of the first because Jane provided several details in the second video that she had not provided in the first video. Nor was the second video unduly duplicative of other evidence presented in the case. Jane's 911 call was entered into evidence, but it contained the same information as the first Sgt. Cauley video, not the second. Her 911 call stated her parents' names, her address, and that her father had killed her mother with a pan and left. Jane's trial testimony likewise did not render the second Sgt. Cauley video unduly duplicative, as the only overlap in her trial testimony was that Gray told her to go to a backroom, that she heard a loud noise, and that she found Tabitha dead in the kitchen.

Given that "[n]ot all evidence that is duplicative is therefore cumulative, and evidence should not be excluded on this ground merely because it overlaps with other evidence[,]" *Doneghy*, 410 S.W.3d at 109, and that the second Sgt. Cauley video contained very little overlap with the other evidence presented in the case, we cannot conclude that the circuit court's failure to exclude the video resulted in a manifest injustice to Gray.

We likewise disagree with Gray's additional assertion that the second Sgt. Cauley video "served little or no legitimate evidentiary purpose other than to engender sympathy for the victim[.]" *Hunt*, 304 S.W.3d at 40 (citing *Ice v. Commonwealth*, 667 S.W.2d 671, 676 (Ky.1984)). The video clearly served a

24

legitimate evidentiary purpose, as it is the first point in the timeline of the investigation in which Jane provides a somewhat narrative account of the crimes. Moreover, Jane was no longer crying by the time the second video was recorded and she recounted what occurred in a calm manner.

We hold that no error occurred in the admission of the second Sgt. Cauley video, palpable or otherwise, and affirm.

## D. The Commonwealth's opening statement was not prosecutorial misconduct.

Gray acknowledges he did not preserve his next assertion of error via contemporaneous objection and requests review for palpable error. At the end of the Commonwealth's opening statement, it said:

> [Jane] lives every day with a new normal. Activities as simple as doing homework become painful reminders of her mother who's not there to do it with her. The mother she was supposed to gossip with boys about. The mother that was supposed to make sure her room was clean. The mother that cooked her and her family dinner every night. The mother she'll never see again.

Gray argues that this opening statement resulted in manifest injustice because it crossed the line into victim impact evidence. Certainly, had such evidence been elicited by the Commonwealth during the testimony of a witness, it would be considered victim impact evidence as opposed to victim background evidence. *See, e.g.*, *Ernst*, 160 S.W.3d at 763 (comparing victim impact evidence to victim background evidence). However, it is well established that "[w]hat is said in opening statement is not evidence." *Tackett*, 445 S.W.3d at 30. The Commonwealth accordingly could not have run afoul of the rule

25

against eliciting victim impact evidence during the merits phase of the trial, and the true issue here is whether the Commonwealth's comments amounted to prosecutorial misconduct. *Cf. id.*

Prosecutors are given considerable leeway during both opening statements and closing arguments. *See, e.g.*, *Mayse v. Commonwealth*, 422 S.W.3d 223, 227 (Ky. 2013). However, prosecutorial misconduct can occur in the form of "a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Leavell v. Commonwealth*, 671 S.W.3d 171, 182 (Ky. 2023) (internal quotation marks omitted). An allegation of prosecutorial misconduct must be considered within the context of the overall fairness of the trial and "[t]o justify reversal, the Commonwealth's misconduct must be so serious as to render the entire trial fundamentally unfair." *Id.* at 183 (internal quotation marks omitted). And, if the defendant failed to object, this Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Id.* In turn, to determine whether the challenged conduct was flagrant, this Court weighs four factors: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Barrett v. Commonwealth*, 677 S.W.3d 326, 334 (Ky. 2023).

As Gray failed to object, we first address whether the conduct was flagrant. This Court can safely presume the Commonwealth's statements did

26

not mislead the jury; certainly, Jane's life is more difficult and sorrowful without her mother. The statements are obvious given that the victim is deceased. But, the statements could have resulted in some prejudice to Gray. The first flagrancy factor therefore leans in Gray's favor. The second factor, however, weighs in favor of the Commonwealth as the excerpted statement above was the only one made by the Commonwealth. The third factor leans in Gray's favor, as the Commonwealth deliberately made the challenged remarks. But the final factor leans strongly in favor of the Commonwealth: within mere minutes of Tabitha being shot Jane, who was present in the home during the murder, called 911 and identified Gray by name as the perpetrator. Gray was apprehended less than four hours later in Tabitha's vehicle with one of her debit/credit cards, handwritten directions to a city in a different state, and the gun that killed her on his person.

On balance, and with particular emphasis on the strength of the evidence against Gray and the fundamental fairness afforded him during his trial, we cannot conclude that the Commonwealth's opening statement was flagrant prosecutorial misconduct, and we affirm. However, this Court cautions that it is certainly not best practice to make such statements during opening, as it is meant solely as a vehicle for the Commonwealth to "state to the jury the nature of the charge and the evidence upon which the Commonwealth relies to support it[.]" RCr 9.42.

**E. The challenged portions of Det. Williamson's testimony did not result in manifest injustice.**

Gray next argues that three pieces of testimony given by lead detective Eric Williamson invaded the province of the jury in determining Gray's guilt or innocence and therefore constituted reversible error. Gray concedes he did not object to any of the statements, rendering his arguments unpreserved. He has instead requested review for palpable error pursuant to RCr 10.26. As noted, this Court will only conclude palpable error occurred if we discern that there was "a substantial possibility that the result in the case would have been different without the error." *Brewer*, 206 S.W.3d at 349. With that said, we will address each piece of challenged testimony in turn.

The first occurred during the Commonwealth's direct examination of Det. Williamson. The detective had just explained that two spent shell casings were found on Tabitha's lap. Then the following exchange occurred:

> **CW:** What, if any, significance did you attribute to the shell casings on her lap?
>
> **Det.:**[14] The shell casings that were on top of her body, it appears Mr. Gray stood over top of Ms. Tabitha and shot, she had two, let me go back a little bit. She had two bullet holes in her face. And it appears, being that those shell casings were on top of her legs, that Mr. Gray had to be standing over top of her after she had been shot the first time and shot her two more times in the face.

The detective then explained that shell casings eject from a gun when a bullet is fired, and further discussed that a third spent shell casing was found beneath Tabitha's body. Then:

---

[14] Det. Williamson.

28

**CW:** What significance do you attribute to the fact that her body was on top of a shell casing?

**Det.:** So, based off the autopsy and our investigation, it appears that the first gunshot that Tabitha received was to the back of the head while she was cooking supper for her family. She was standing in the kitchen, she received the first gunshot to the back of the head. When that shell casing was ejected it fell to the

ground and then she fell on top of it. There's no other way that shell casing could've got there. And then, after she was dead from that gunshot wound, or more than likely dead, Mr. Gray stood over top of her and shot her two more additional times.

Gray argues that the foregoing testimony invaded the province of the jury to decide his guilt or innocence. *See Nugent v. Commonwealth*, 639 S.W.2d 761, 764 (Ky. 1982). We disagree. Although the detective explains the significance of the shell casings' locations by stating where "Mr. Gray" had to have been when the shots were fired, in context the testimony was clearly meant to explain how the detective believed the shell casings ended up where they did. The detective did not make a statement that he believed Gray to be guilty. *Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky. 1997) (holding "If [the witness] had testified that he believed Appellant to be guilty, such would have been an opinion as to the ultimate issue. However, an opinion that a result is consistent with a factual scenario is not an opinion that the scenario occurred.").

The second piece of challenged testimony occurred when Det. Williamson was discussing Gray's arrest in Mt. Vernon, Illinois. He testified that when Gray was arrested, he "had the murder weapon in his pocket. We were able to collect that firearm, test that firearm, and the three shell casings at the scene

29

of Tabitha's murder were fired from the gun Mr. Gray had in his possession when he was arrested in Mt. Vernon, Illinois." Again, we cannot conclude that this was an opinion as to the ultimate issue of Gray's guilt or innocence. Rather, it was the detective explaining that the pistol found on Gray's person when he was arrested was the same gun that was used to murder Tabitha. This testimony was consistent with the firearms and toolmark identification expert's testimony regarding the shell casing comparisons he made. It was still left to the jury to determine what significance to attribute to those facts.

The third and final portion of testimony Gray argues mandates reversal of his conviction occurred at the end of the Commonwealth's direct examination of Det. Williamson:

> **CW:** After conducting your investigation and reviewing all the evidence, did you have any other suspect besides the defendant?
>
> **Det.:** No.
>
> **CW:** Why?
>
> **Det.:** Because he's the one that did it.
>
> **CW:** Why do you say that?
>
> **Det.:** Well, like I said earlier, given the information that we received from [Jane] when we arrived on scene; given that there was no forced entry, nobody broke in, kicked in or did anything like that; there was no witnesses, nobody came forward, no other information on anybody else involved ever came up during the course of the investigation; the fact that Mr. Gray fled the scene with a one year old and his three kids, fleeing to St. Louis and he's located three and a half hours away, not cooperating with police, giving them false information; and then the fact that in his pocket is the murder weapon, when we did the forensics on it matched the three shell casings that were found at the scene of Tabitha's murder.

30

Despite the detective's reasoning behind his statement that Gray was "the one that did it[,]" this was clearly inappropriate testimony in which the detective opined on the ultimate issue of guilt or innocence and was therefore error. However, given the strength of the evidence against Gray, as discussed *supra*, we cannot conclude that there was a substantial possibility that, absent this error, the outcome of the trial would have been any different. Thus, the error was not palpable.

## F. The victim impact testimony given by one of Tabitha's sisters during final sentencing that implied a separate, uncharged offense did not result in manifest injustice.

Gray acknowledges his final assertion of error was not preserved for our review via contemporaneous objection, but he requests review for palpable error. We will accordingly affirm unless we conclude there is a substantial possibility that the outcome would have been different absent the error. *Brewer*, 206 S.W.3d at 349. During final sentencing before the circuit court judge Tabitha's older sister Katrina, with whom Jane now lives, gave a victim impact statement that included the following:

> Three lives [were] taken in this crime. Tabitha who is deceased. [Jane] is her daughter who has to relive seeing her mother on the kitchen floor with blood coming from her head at the age of six years old, being tied up in a chair, being sexually abused. And then there's [the baby], [taken] from his mother, his sister, his aunts, cousins, and grandfather, the only people that he knows, the people who he was around since birth to now be kept away because of Richard Gray.

Gray argues that because he was never accused of or charged with sexual abuse, it was manifest injustice for the sentencing judge to hear a victim impact statement that suggested he committed another, uncharged crime. We

31

disagree. As Katrina's statement occurred during final sentencing, a jury had already previously recommended the maximum sentences for both of Gray's convictions, and the issue to be addressed at sentencing was whether the circuit court judge would impose those recommended sentences. That same judge presided over both the guilt and penalty phases of the trial and would

have been fully aware of the charges and evidence against Gray as well as the fact that an allegation Gray had sexually abused Jane was not part of the Commonwealth's case. This Court accordingly discerns no basis to hold that there is a substantial possibility that the outcome of Gray's sentencing would have been any different absent Katrina's fleeting comment, and we affirm.

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

James Havey
Assistant Solicitor General